## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| Sonya Campbell | : | |
| c/o Vasseghi Budd PLLC | : | |
| 9663 Main Street, Suite A | : | |
| Fairfax, VA 22031 | : | Civ. Action No. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | ***Jury Trial Demanded*** |
| | : | |
| Becton, Dickinson and Company | : | |
| 7 Loveton Circle | : | |
| Sparks Glencoe, MD 21152 | : | |
| | : | |
| SERVE: | : | |
| The Corporation Trust, Inc. | : | |
| 2405 York Road, Suite 201 | : | |
| Lutherville Timonium, MD 21093-2264 | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff Sonya Campbell, through counsel, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This charge is brought on behalf of Plaintiff Sonya Campbell ("Plaintiff" or "Ms. Campbell") against Defendant Becton, Dickinson and Company ("Defendant" or "BD") for violations of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act ("ADAAA") (collectively, the "ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Family and Medical Leave Act ("FMLA"), and the Maryland Fair Employment Practices Act ("FEPA"). As a person with disabilities and a woman, Plaintiff was

held to a different standard in standards and discipline related to her employment with Defendant.

## THE PARTIES

2.      Plaintiff is a disabled female who currently resides in Annapolis, Maryland, where her home office is located, and was formerly employed by Defendant.

3.      Defendant is a global medical technology company formed under the laws of the State of New Jersey with its principal place of business and headquarters located at 1 Becton Drive, Franklin Lakes, New Jersey 07417. Defendant is registered and authorized to do business in the State of Maryland and regularly conducts business in Baltimore County, where it has an office located at 7 Loveton Circle, Sparks Glencoe, Maryland 21152. Defendant employs more than 75,000 employees nationwide.

4.      Defendant was, at all relevant times, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws.

5.      Plaintiff was, at all relevant times, Defendant's "employee" within the meaning of all relevant Federal, State and local laws.

6.      Plaintiff is and was, at all relevant times, "disabled" within the meaning of all relevant Federal, State and local laws, including, but not limited to, the Americans with Disabilities Act ("ADA").

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617, because this is a civil action arising under the laws of the United States. This Court also has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

**VENUE**

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims took place in Maryland.

**CONDITIONS PRECEDENT**

9.      All conditions precedent to filing the instant action have been fulfilled.

10.     Plaintiff timely filed an Inquiry of Discrimination with the Maryland Commission on Civil Rights ("Maryland Commission") on July 19, 2021.

11.     On August 5, 2021, Plaintiff filed a timely Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC").

12.     Because Plaintiff had filed with the EEOC, the Maryland Commission declined to further investigate Plaintiff's Inquiry of Discrimination.

13.     On August 25, 2022, after concluding its investigation into Plaintiff's Charge, the EEOC issued Plaintiff a Notice of Right to Sue, and this action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

**FACTUAL BACKGROUND**

**Plaintiff Flourishes in Medical Device Sales**

14.     Ms. Campbell is a highly qualified and experienced senior sales representative with expertise in medical devices.

15.     Prior to her employment at Becton, Dickinson & Company ("BD"), Ms. Campbell worked as a Sales Consultant for CareFusion beginning in 2010, where she excelled in her position.

16.    In 2015, BD acquired CareFusion.

17.    Ms. Campbell continued to outperform her peers and move up within BD.

18.    From 2015 to 2019, Ms. Campbell worked as a Sales Consultant  at BD without issue or disciplinary action.

19.    In December 2017, BD acquired C.R. Bard, Inc. ("Bard").

20.    In 2019, Ms. Campbell's team was reorganized and was replaced with a largely former Bard team, which included Bard management, to create a new business unit—BD Peripheral Intervention.

21.    Ms. Campbell was selected to stay with BD, while many of her colleagues were laid off.

22.    Ms. Campbell was assigned to the Peripheral Intervention–Oncology sales team.

23.    As part of the reorganization, employees were given new titles. Ms. Campbell was given the title of Senior Territory Manager, due to her tenure and performance.

24.    Ms. Campbell worked for CareFusion and BD for over ten years before her wrongful termination and had over fifteen years of experience in the industry.

**Joseph Pitcher Derails Plaintiff's Upward Career Trajectory
with Unwanted Sexual Harassment**

25.    In fall 2019, Ms. Campbell met her new team and her new immediate supervisor, Joseph Pitcher ("Mr. Pitcher"), a former Bard employee and a relatively new and inexperienced sales manager.

26.    Mr. Pitcher almost immediately began paying extra attention to Ms. Campbell. For example, during the October 2019 dinner event where Mr. Pitcher and Ms. Campbell met for the first time, Mr. Pitcher leaned into Ms. Campbell at the bar and whispered in her ear, "I've

met you before," in a predatory and sexual manner, making Ms. Campbell extremely uncomfortable.

27.     Ms. Campbell subsequently learned from a colleague that a former colleague had sent Mr. Pitcher and other colleagues' photos of her in a bikini before she met Mr. Pitcher for the first time.

28.     In November 2019, while attending a large conference where the BD team was staying overnight, Mr. Pitcher's hotel room was across the hall from Ms. Campbell. Ms. Campbell had attended numerous conferences before, and her colleagues' rooms were never near hers. Ms. Campbell felt like Mr. Pitcher was intentionally trying to be alone with her.

29.     Ms. Campbell felt extremely uncomfortable being around Mr. Pitcher, but did not feel like she could complain about his comments to BD management or Human Resources ("HR") because she believed that she would be retaliated against.

30.     Despite her years of experience and high-ranking sales, Mr. Pitcher singled Ms. Campbell out for extra monitoring, extra one-on-one time, and extra ride-alongs. Mr. Pitcher did not do so with the other sales representatives and at least one colleague mentioned that she believed Mr. Pitcher singled Ms. Campbell out for ride-alongs because he was attracted to Ms. Campbell.

31.     Mr. Pitcher often made inappropriate comments to Ms. Campbell regarding her appearance and sometimes did so publicly. For example, at a conference dinner with several other Bard colleagues, Mr. Pitcher told Ms. Campbell, "you look hot" while he was visibly intoxicated. Mr. Pitcher did not make similar statements regarding other women in attendance at the conference.

32.     Mr. Pitcher's inappropriate comments and behavior continued during his and Ms. Campbell's scheduled field rides, during which time they were alone, beginning in October 2019. For example, during a field ride in early 2020, when Ms. Campbell returned from a vacation in Mexico with her family, Mr. Pitcher launched into an inappropriate discussion with her regarding Burning Man (a festival where it is well known that attendees engage in heavy drug use) and asked questions regarding recreational drug use. Ms. Campbell was again uncomfortable and did not encourage further conversation; however, Mr. Pitcher continued to press on the subject.

33.     Ms. Campbell never responded positively to Mr. Pitcher's requests; however, Mr. Pitcher was relentless and continued to sexually harass Ms. Campbell and make her feel uncomfortable.

**The COVID-19 Pandemic Begins, Plaintiff's Mental Health Begins to Suffer,
and Mr. Pitcher's Behavior Escalates**

34.     In spring 2020, as the pandemic was picking up steam, Ms. Campbell's mental health began to suffer.

35.     Mr. Pitcher became erratic and demanding with Ms. Campbell during the height of the pandemic—March through June 2020—when elective procedures ceased, and her customers were suffering financially. Mr. Pitcher also constantly berated Ms. Campbell, despite her record as a high-performing employee.

36.     Mr. Pitcher's behavior and unwanted attention, sometimes threatening and always relentless, began to interfere with Ms. Campbell's ability to perform her job.

37.     Mr. Pitcher's sexual harassment continued throughout the pandemic. For example, during a ride-along, Mr. Pitcher expressed how relieved he was that he was recovered from COVID-19 and could get "back into the bedroom." He then stated that "it's been a long

year," implying that he and his wife had not had sex or been intimate for a year. This again made Ms. Campbell extremely uncomfortable and speechless.

38.     Ms. Campbell suffers from complex post-traumatic stress disorder ("PTSD") stemming from abuse she endured as a minor, attention-deficit/hyperactivity disorder ("ADHD"), insomnia, generalized anxiety disorder ("GAD"), and major depression.

39.     To ensure that she was able to best complete her duties, Ms. Campbell alerted her prior supervisors, HR, and other management representatives at BD of her disabilities.

40.     Prior to working under Mr. Pitcher's supervision, Ms. Campbell had requested an accommodation for her insomnia.

41.     When Ms. Campbell began working with Mr. Pitcher, she alerted him to her accommodation for her insomnia.

**Plaintiff Requests and is Denied Reasonable Accommodations**

42.     BD's company policy requires that an employee first reach out to their direct manager for an accommodation request.

43.     Ms. Campbell was on several medications, including medications for her insomnia that affected her alertness in the morning.

44.     Mr. Pitcher insisted on early morning meetings and often berated Ms. Campbell if she did not give rapid-fire answers to his questions.

45.     In late April 2020, Ms. Campbell asked Mr. Pitcher for a meeting to discuss accommodations.

46.     In May 2020, Ms. Campbell met with Mr. Pitcher to request accommodations relating to the start time of their meetings. Specially, Ms. Campbell notified Mr. Pitcher that the

start time of their meetings was problematic for her due to the side effects of her insomnia medication.

47.     Mr. Pitcher not only refused this reasonable accommodation but intimidated and ridiculed her for requesting the accommodation in the first place.

48.     Ms. Campbell was discouraged from seeking accommodations or exercising her rights under state and federal laws relating to disability protections.

49.     While Ms. Campbell's accommodation request was for a later start time and not mental health treatment, BD later directed Ms. Campbell to an Employee Assistance Program ("EAP").

50.     Despite the incongruity of this solution, Ms. Campbell reached out to the EAP for assistance but was unable to meet with a mental health provider because of the increased demand caused by the COVID-19 pandemic.

51.     Ms. Campbell subsequently met with a psychologist; however, she was forced to pay for this treatment out of her own pocket.

52.     BD failed to provide Ms. Campbell with reasonable accommodations and further failed to even begin to engage in the interactive process with her.

53.     Mr. Pitcher's behavior became increasingly aggressive toward Ms. Campbell after she revealed her mental health issues by seeking accommodations. Mr. Pitcher's increased hostility triggered Ms. Campbell's PTSD.

54.     Mr. Pitcher showed his disdain for mental health and mental disabilities in other ways during Ms. Campbell's employment.

55.     For example, Mr. Pitcher "joked" with Ms. Campbell regarding another sales representative, Eric Rudiak, who committed suicide in early 2020. Shortly after his death, Mr. Pitcher stated to Ms. Campbell that Mr. Rudiak "should have just gotten another job."

56.     Ms. Campbell was appalled and replied stating that Mr. Rudiak should have stopped working and used his medical leave because that was the intended purpose of the leave. Ms. Campbell was upset by Mr. Pitcher's comments—comments from her direct supervisor.

57.     She felt that if Mr. Pitcher thought that mental health struggles, including being suicidal, did not justify taking leave, Mr. Pitcher certainly would not understand her PTSD, ADHD, insomnia, GAD, or major depression.

58.     Although Mr. Pitcher tried to joke about Mr. Rudiak's suicide with Ms. Campbell, she protested at his inappropriate "humor" and complete lack of empathy towards her former colleague. Ms. Campbell spoke up and let Mr. Pitcher know that Mr. Rudiak's suicide and previous mental health struggles were serious matters.

### Mr. Pitcher Punishes Plaintiff More Harshly Than Men and Non-Disabled Employees

59.     Additionally, Ms. Campbell has a diagnosis of attention-deficit/hyperactivity disorder ("ADHD") and was diagnosed at the time she made her initial accommodation request.

60.     Part of Ms. Campbell's position as a Senior Territory Manager involved submitting paperwork and responding to a steady stream of customer inquiries—a task that can be challenging for an individual with ADHD, as executive functioning struggles are inherent with this disability.

61.     Instead of approving the reasonable accommodation requested in their April 2020 conversation, once Ms. Campbell revealed her disabilities to Mr. Pitcher, he became even more

demanding and hostile, which exacerbated Ms. Campbell's GAD, ADHD, PTSD, insomnia, and depression symptoms.

62.     The constant emails, text messages, and phone calls criticizing and shaming Ms. Campbell, which were unrelated to her performance, caused Ms. Campbell to experience severe PTSD symptoms. At times the constant barrage of verbal and written attacks felt like stalking to Ms. Campbell.

63.     For example, in July 2020, Ms. Campbell was berated for missing a meeting. Another colleague also missed the meeting; however, Mr. Pitcher did not berate the other colleague or even mention the missed meeting to her.

64.     Ms. Campbell also took paid-time off ("PTO") because she had been in close contact with two (2) individuals who had tested positive for COVID-19 in July 2020, and she was not feeling well.

65.     Despite being on PTO, Mr. Pitcher scheduled a call with a client and invited Ms. Campbell.

66.     Ms. Campbell did not attend because she was out on PTO due to potentially having COVID-19.

67.     Mr. Pitcher berated Ms. Campbell for missing the meeting and told her she should have requested PTO, despite that Ms. Campbell had already requested PTO and it had been approved.

68.     The stress and increased anxiety caused by Mr. Pitcher's harassment worsened Ms. Campbell's ADHD, PTSD, and GAD symptoms and led to more abuse and berating by Mr. Pitcher.

69.     Although Ms. Campbell's sales numbers exceeded expectations, even amidst a pandemic, Mr. Pitcher continued to focus on Ms. Campbell and push her to her breaking point.

70.     Mr. Pitcher held Ms. Campbell to a different standard than her male counterparts as well as those employees without disabilities.

71.     As a result, Ms. Campbell was advised by her physician to take FMLA leave for her mental health issues in July 2020.

**Plaintiff Goes on FMLA Leave for Her Disabilities**

72.     As a result of Mr. Pitcher's relentless harassment, Ms. Campbell was advised by her physician to take FMLA leave for her mental health issues in July 2020.

73.     Ms. Campbell was on FMLA leave from July 15, 2020 through October 27, 2020.

74.     Prior to returning to work, in October 2020, Ms. Campbell submitted multiple forms and substantiating documents from her physician to BD's third-party benefits provider, Sedgewick, in support of her accommodation request.

75.     Sedgewick responded that additional information was needed to clarify her request and specific accommodations and that someone from Sedgewick would be back in touch with her.

76.     Ms. Campbell was in the process of getting back into her work and was extremely frustrated with how BD and Sedgewick were treating her accommodation request. She attempted to contact Sedgewick again on multiple occasions to straighten out the alleged discrepancy. She was told that a representative from Sedgwick would contact her and guide her through the process of requesting a reasonable accommodation—a contact that never occurred.

77.     Ms. Campbell left multiple messages with Sedgewick to obtain assistance with her accommodation request; however, her calls were not returned and no one from BD or

Sedgwick engaged in the interactive process with Ms. Campbell in response to her accommodation request.

78.     No one from Sedgewick or BD ever got back to Ms. Campbell regarding her request.

79.     Despite failing to respond to Ms. Campbell's request for accommodation, BD requested a statement from Ms. Campbell's doctor which cleared her to return to work. Ms. Campbell reached out to her physician again, at her own cost, and requested a letter that stated she was able to return to her position at the end of her FMLA leave.

80.     Ms. Campbell provided BD with a letter clearing her to return to work, as directed by BD, solely concerning her FMLA leave.

81.     Ms. Campbell never received a call back from Sedgewick or BD regarding her accommodation request.

**Defendant Retaliates Against Ms. Campbell for Taking FMLA
Leave for Her Mental Health Issues**

82.     Immediately upon her return, Mr. Pitcher resumed hounding Ms. Campbell about her performance, reprimanding her verbally and in writing.

83.     On November 4, 2020, just one week after Ms. Campbell returned to work from job-protected FMLA leave, Mr. Pitcher told Ms. Campbell that she was not performing up to standard and her numbers were down, despite her being out on FMLA leave for part of the year.

84.     A few weeks later, on November 19, 2020, Mr. Pitcher scheduled a field visit with Ms. Campbell. During the field visit, Mr. Pitcher berated Ms. Campbell regarding her performance, holding her to the same numbers her teammates that had not been on job-protected leave were held to.

85.     Following the field visit, on November 20, 2020, Mr. Pitcher submitted a "Field Visit Follow Up" memorandum flagging Ms. Campbell's alleged poor performance in an attempt to paper Ms. Campbell's file in anticipation of her retaliatory termination.

86.     In the memorandum, Mr. Pitcher falsely stated that Ms. Campbell's sales ranking was 52/74 in 2020.

87.     In fact, Ms. Campbell's sales ranking was 36/74 nationwide amongst BD's Territory Managers for 2020.

88.     The numbers Mr. Pitcher was holding Ms. Campbell to for 2021 were not adjusted to account for Ms. Campbell's FMLA leave.

89.     Additionally, Mr. Pitcher flagged issues with Ms. Campbell's sales pipeline, which again was impacted by Ms. Campbell being out on job-protected FMLA leave.

90.     The memorandum also falsely stated that Ms. Campbell's 2020 performance was lacking, in addition to her 2021 performance.

**Plaintiff Notifies Human Resources Regarding Mr. Pitcher's
Harassment and Retaliation**

91.     Mr. Pitcher continued to single Ms. Campbell out and berate her regarding her alleged poor performance, holding her to a different standard than her colleagues.

92.     Ms. Campbell was extremely intimidated by Mr. Pitcher and was reluctant to voice her concerns to HR for fear of retaliation.

93.     Mr. Pitcher made several comments throughout the course of Ms. Campbell's employment with BD that made it clear that he had no sympathy for any employee with disabilities, particularly those with mental disabilities. One such example was Mr. Pitcher's insensitive comments regarding former BD employee Eric Rudiak's mental health issues and suicide.

13

94.     In December 2020, Ms. Campbell spoke with Crystal Barlow ("Ms. Barlow"), BD's HR Advisor, detailing Mr. Pitcher's abusive behavior and sexual harassment that she faced on a weekly, if not daily, basis. She also told Ms. Barlow about the bikini photos and detailed Mr. Pitcher's behavior toward her, making clear she believed this behavior was sexual harassment.

95.     During this conversation, Ms. Campbell again requested assistance for her ADHD and PTSD symptoms.

96.     The very next day, December 11th, Mr. Pitcher singled Ms. Campbell out and met with her regarding her "poor performance."

97.     Despite being out on FMLA leave, Ms. Campbell was still meeting her sales quotas, based on a full year of work, and surpassing her peers.

98.     No one from BD or Sedgewick, including Ms. Barlow, followed up with Ms. Campbell regarding her December 2020 accommodation request.

99.     On December 20th, Laurie McGlone, BD's Senior Employee Relations Advisor, later told Ms. Campbell that the bikini pictures were "being taken care of" and that Mr. Pitcher "had been addressed," but she did not give Ms. Campbell any additional information.

100.    Ms. Campbell was never contacted for an investigation into her sexual harassment complaint.

101.    Mr. Pitcher's behavior toward Ms. Campbell not only continued but worsened after her December 2020 complaint.

**Plaintiff is Retaliated Against and Placed on a
Performance Improvement Plan**

102.    Despite Mr. Pitcher's hostility toward her, Ms. Campbell continued to exceed her sales targets as evidenced by her March 2021 sales rankings. Ms. Campbell ranked in the top

50% of Territory Managers nationwide—36/74—for her sales performance. Thus, Ms. Campbell outperformed most of her team, including Mr. Pitcher.

103.    Even though Ms. Campbell was outperforming her peers and supervisor, shortly after Ms. Campbell complained to HR regarding Mr. Pitcher's harassing and discriminatory behavior, and requested accommodations for her disabilities, on March 2, 2021, Mr. Pitcher placed Ms. Campbell on a Performance Improvement Plan ("PIP").

104.    The PIP contained unreasonable expectations and fabricated allegations. While Ms. Campbell should not have been held to the same standard as her peers given her four-month FMLA leave, she still exceeded these unreasonable expectations.

105.    Ms. Campbell's sales placed her 52/74 among BD Territory Managers nationwide for Fiscal Year 2020.[1] This number exceeded a third of her peers who had worked the entire year.

106.    Just one week after being placed on a PIP, the Oncology DSR report placed Ms. Campbell at 94.1% YTD performance to quota, making her the third-highest performing member of her eight-person team—once again outranking Mr. Pitcher. Thus, her actual performance numbers dramatically differ from the spurious numbers in her PIP wherein Mr. Pitcher claimed that Ms. Campbell ranked 70th out of 74 territory managers in the 2021 Fiscal Year.

107.    In her PIP, Mr. Pitcher penalized Ms. Campbell for not selling an extremely expensive product, the Gamma Finder 3, and demanded that she do so within sixty days to keep her job. However, no team member had sold the product as of March 2, 2021, and the device carries zero quotas for the year, meaning neither Ms. Campbell nor anyone on her team was required to sell the product. Her failure to complete this difficult and unnecessary sale was eventually cited as a reason for her termination.

108.    Additionally, the PIP penalized Ms. Campbell for her tardiness and missed deadlines. These problems could have been ameliorated if Ms. Campbell had been given the reasonable accommodations that she repeatedly requested.

109.    The demands detailed in the PIP likewise disregarded Ms. Campbell's known disabilities and her documented need for accommodations. For example, Ms. Campbell was required to meet with Mr. Pitcher weekly at 9:00 a.m. even though he was on notice that the grogginess side effects of Ms. Campbell's insomnia medications made morning meetings difficult for her. Likewise, the PIP put in place significant time-sensitive demands that were difficult for Ms. Campbell to fulfill without accommodations for her ADHD and PTSD.

110.    Mr. Pitcher, BD management, and HR were well aware of Ms. Campbell's disabilities, as well as the tasks that would be difficult for Ms. Campbell to perform without reasonable accommodations, and the fact that she did not have any accommodations. Mr. Pitcher deliberately conditioned Ms. Campbell's job on demands that he knew she was likely unable to meet. Interestingly enough, the PIP states that Mr. Pitcher raised his "performance concerns" with Ms. Campbell previously; however, he cites to a Field Ride letter dated November 11, 2020, where she was rated "needs improvement" just as she was returning to work from job-protected FMLA leave, and a discussion on December 11, 2020. Mr. Pitcher fails to state the substance of the conversation on December 11, 2020.

111.    Mr. Pitcher does not cite any support for the PIP other than those two conversations and Ms. Campbell allegedly not meeting her sales goals for FY2020,[1] when she was out on job-protected FMLA leave for a good portion of the year.

---

1.      BD's Fiscal Year runs from October 1st through September 30th.

112.    In March 2021, after being placed on the retaliatory PIP, Ms. Campbell spoke with Ms. McGlone regarding Mr. Pitcher's harassment and retaliatory behavior.

113.    After this conversation, Ms. Campbell finally received a request for information regarding her accommodation request. However, at that time, Ms. Campbell was consumed with the unreasonable demands placed on her by Mr. Pitcher to save her job and she felt she could not leave work to visit a physician and complete the paperwork without facing retaliation.

114.    Ms. Campbell informed Defendant of her disabilities and made repeated requests for reasonable accommodations. Defendant refused those requests, and, consequently, her supervisor became increasingly hostile.

115.    At the same time, Mr. Pitcher, who had the authority to place her on a PIP and terminate her position, was constantly harassing Ms. Campbell, and continuing to treat her differently than her fellow sales representatives, to the point where she had to take a medical leave of absence to recover. Despite excellent job performance and pleas to HR for reasonable accommodations and help mitigating Mr. Pitcher's harassment, Ms. Campbell was placed on a PIP with unrealistic expectations in retaliation for exercising her rights to take leave and to request accommodations for her disabilities.

116.    Ms. Campbell was penalized for not meeting the unrealistic expectations of her PIP and was eventually terminated for poor performance—a baseless claim given her performance history. BD discriminated and retaliated against Ms. Campbell because of her disabilities and based on her being a female. As a result, Ms. Campbell has suffered and continues to suffer financial and emotional harm.

117.    Despite the passion and excellence with which Ms. Campbell performed her

duties as a BD senior sales representative, she suffered ongoing sexual harassment and

retaliation, disability discrimination and retaliation, and FMLA retaliation.


**Plaintiff's Termination**

118.    On May 4, 2021, BD terminated Ms. Campbell's employment, citing failure to

meet the unrealistic expectations in the PIP.

119.    Ms. Campbell's termination letter cited her failure to meet the 2021 Fiscal Year

sales quota which was originally $450,000. However, shortly after her termination, BD reduced

each sales representative's quota to $350,000, making Ms. Campbell's YTD around 97% at her

termination. The reasons given for her termination were baseless pretenses for BD's overt

discrimination.

120.    The standards Ms. Campbell was being held to in her role and as identified in the

PIP far exceeded the roles and responsibilities of her position as a Senior Territory Manager and

exceeded what was expected of any of the other members of her team.

121.    As a result of Defendant's discrimination, harassment, and retaliation, Ms.

Campbell suffered extreme emotional distress including, but not limited to, increased anxiety,

exacerbated symptoms of insomnia, loss of appetite, and depression.

**COUNT I**
*(Failure to Provide a Reasonable Accommodation in Violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.)*

122.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth

herein.

123.    Ms. Campbell suffers from attention-deficit hyperactivity disorder ("ADHD"), complex post-traumatic stress disorder ("PTSD"), insomnia, generalized anxiety disorder ("GAD"), and major depression, making her a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111 of the ADA.

124.    Plaintiff was a qualified individual with a disability entitled to protections under the ADA, as she was an individual who, with or without reasonable accommodation, could perform the essential functions of her employment position.

125.    Plaintiff was fully qualified for the position of Senior Territory Manager for Defendant and able to perform the essential functions of the job if an accommodation had been made.

126.    In fall 2019, when Ms. Campbell met her new team, to ensure that she was able to best complete her duties, Ms. Campbell alerted her supervisor, Mr. Pitcher, human resources ("HR"), and other management representatives of BD of her disabilities.

127.    In April 2020, per BD company policy, Ms. Campbell reached out to Mr. Pitcher, her direct manager, about scheduling a meeting to discuss accommodations.

128.    In May 2020, Ms. Campbell formally notified Defendant about her disabilities and made her first formal request for reasonable accommodations for a later start time to her and Mr. Pitcher's morning meetings, so that the side effects of Ms. Campbell's insomnia medications could wear off and she could be more alert for the meetings and Mr. Pitcher's rapid-fire questions.

129.    Mr. Pitcher refused to provide this reasonable accommodation and intimidated and ridiculed Ms. Campbell for requesting the accommodation in the first place.

130.    On or around October 26, 2020, upon returning to work after job-protected FMLA leave, Ms. Campbell made another request for reasonable accommodations for her ADHD and PTSD to Defendant through Sedgewick.

131.    At that time, Ms. Campbell clearly stated that she was seeking accommodations relating to her executive functioning deficits. She provided documentation from her physician to support the same.

132.    On October 27, 2020, a Sedgewick representative responded to Ms. Campbell's request stating that it "was not very clear as to what accommodations are needed" and that Sedgewick would be reviewing her request and would get back to her.

133.    Sedgewick never followed up with Ms. Campbell regarding her October 2020 request for accommodations.

134.    Ms. Campbell attempted to follow-up with Sedgewick on multiple occasions, despite the ball being in Sedgewick's court, but did not receive a response to her request for accommodations.

135.    In December 2020, during her meeting with Ms. Barlow, BD's HR Advisor, Ms. Campbell notified Defendant and made another request for reasonable accommodations for her ADHD and PTSD.

136.    No one from BD, including Ms. Barlow, followed up with Ms. Campbell regarding her December 2020 request for reasonable accommodations.

137.    In March 2021, Ms. Campbell again notified Defendant, through a telephone call with Laurie McGlone, Senior Employee Relations Advisor, about her disabilities, making yet another request for reasonable accommodations.

138.    In March 2021, after receiving the PIP upon her return to work, Ms. Campbell spoke with Ms. McGlone regarding Mr. Pitcher's harassment and retaliatory behavior. Following this conversation, Ms. Campbell finally received a request for information regarding her accommodations request. However, at that time, Ms. Campbell was consumed by the unreasonable demands placed on her by Mr. Pitcher, to save her job, and she felt that she could not leave work to visit a physician and complete the paperwork without facing retaliation.

139.    Plaintiff suffered damages as a result of Defendant's unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

140.    Defendant intentionally violated Ms. Campbell's rights under the ADA with malice or reckless indifference and, as a result, is liable for punitive damages.

## COUNT II
*(Disability Discrimination — Disparate Treatment —in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.)*

141.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

142.    Plaintiff, at all relevant times, is and was a person with a disability and therefore a member of a protected class.

143.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at BD.

144.    As set forth in detail above and herein, Defendant and Mr. Pitcher subjected Ms. Campbell to disparate treatment on the basis of her actual and/or perceived disabilities.

145.    As set forth in detail above, Ms. Campbell informed BD of her disabilities and made repeated requests for reasonable accommodations beginning in April 2020. Defendant,

through HR and Mr. Pitcher, refused those requests, and, consequently, Plaintiff's supervisor,

Mr. Pitcher, became increasingly hostile.

146.    As set forth in detail above, Mr. Pitcher not only refused to provide Ms. Campbell

with a later meeting start time reasonable accommodation for her insomnia, but he also

intimidated and ridiculed her for requesting the accommodation in the first place.

147.    Mr. Pitcher also regularly made sarcastic and discriminatory comments to Ms.

Campbell regarding her disabilities. For example, in June 2020, when Ms. Campbell attempted

to discuss her need for accommodations, such as later meeting start times to allow for the side

effects to subside from her insomnia medications, Ms. Pitcher responded, "What, do you want to

call HR?".

148.    On December 10, 2020, Ms. Campbell filed a complaint with HR regarding Mr.

Pitcher's treatment of her. She requested to be transferred to a different manager, and if transfer

was not possible, to receive assistance with her needs for accommodations and intervention with

Mr. Pitcher to discuss accommodations such as changes in supervisory methods.

149.    Defendant discriminated against Plaintiff, in violation of the ADA, when it failed

to provide reasonable accommodations for her known disabilities.

150.    The discrimination that Plaintiff suffered while employed by Defendant severely

affected the terms and conditions of her employment and culminated in Plaintiff's discriminatory

discharge.

151.    Defendant disciplined and took negative employment actions against Plaintiff

because of her disabilities, in violation of the ADA.

152.    Instead of continuing to work with Ms. Campbell and assisting her during the

interactive process so that she could have the accommodations necessary to complete the

essential functions of her position, Defendant put her on a Performance Improvement Plan ("PIP") and ultimately terminated her.

153.    Mr. Pitcher, who had the authority to place Plaintiff on a PIP and terminate her position, constantly harassed Plaintiff and continued to treat her differently than her fellow sales representatives, to the point where she was forced to take a medical leave of absence to recover.

154.    In March 2021, after receiving the PIP upon her return to work, Plaintiff spoke with Laure McGlone regarding Mr. Pitcher's harassment and retaliatory behavior. Following this conversation, Plaintiff finally received a request for information regarding her accommodations request. However, at that time, Plaintiff was consumed with the unreasonable demands placed on her by Mr. Pitcher, to save her job, and she felt that she could not leave work to visit a physician and complete the paperwork without facing retaliation.

155.    On May 4, 2021, Defendant maliciously terminated Plaintiff.

156.    By discharging Plaintiff, Defendant discriminated against her on the basis of her disabilities and violated the ADA, 42 U.S.C. § 12203.

157.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

158.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, depression, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

159.     Accordingly, Defendant discriminated against Plaintiff on the basis of her actual and/or perceived disability by virtue of treating Plaintiff less well than her similarly situated colleagues outside her protected class in violation of her statutory rights as guaranteed by the ADA.

## **COUNT III**

*(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.)*

160.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

161.     As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her actual and/or perceived disabilities in violation of Plaintiff's statutory rights.

162.     Plaintiff was qualified for her position when Defendant fired her.

163.     On December 10, 2020, Plaintiff first engaged in protected activity by complaining to HR about Mr. Pitcher's discriminatory treatment based on Plaintiff's disabilities and requests for reasonable accommodations. Specifically, Plaintiff told Crystal Barlow ("Ms. Barlow"), BD's HR Advisor, about the abusive behavior and sexual harassment that she faced on a weekly, if not daily, basis from Mr. Pitcher. Ms. Campbell also informed Ms. Barlow about the bikini photos and detailed Mr. Pitcher's behavior toward her, making clear she believed this behavior was sexual harassment.

164.     Instead of continuing to work with Plaintiff and assisting her during the interactive process so that she could have the accommodations necessary to complete the essential functions of her position, Defendant put her on a Performance Improvement Plan ("PIP") and ultimately terminated her.

165.    Defendant did not provide reasonable accommodations for Ms. Campbell's disabilities, in violation of the ADA. Instead, Defendant disregarded Ms. Campbell's known disabilities and her documented need for reasonable accommodations in her PIP. Such disregard included, but was not limited to: (1) requiring Ms. Campbell to meet with Mr. Pitcher weekly at 9:00 a.m. despite her insomnia medication side effects and request for later meeting times; (2) placing significant time-sensitive demands on Ms. Campbell that were difficult for her to fulfill without accommodations for her ADHD, GAD, PTSD, insomnia, and major depression; and (3) conditioning Ms. Campbell's job on demands that Defendant and Mr. Pitcher knew Ms. Campbell was unlikely to be able to meet due to her known disabilities and lack of accommodations.

166.    Despite excellent job performance and pleas to HR for accommodations and help in mitigating Mr. Pitcher's harassment, Plaintiff was placed on a PIP with unrealistic expectations in retaliation for exercising her rights to take job-protected leave and to request accommodations for her disabilities.

167.    In March 2021, after receiving the PIP upon her return to work, Plaintiff spoke with Laure McGlone regarding Mr. Pitcher's harassment and retaliatory behavior. Following this conversation, Plaintiff finally received a request for information regarding her accommodations request. However, at that time, Plaintiff was consumed with the unreasonable demands placed on her by Mr. Pitcher, to save her job, and she felt that she could not leave work to visit a physician and complete the paperwork without facing retaliation.

168.    Plaintiff was penalized for not meeting those unrealistic expectations of her PIP and was eventually terminated for poor performance—a baseless claim given her performance history.

169.     Less than five (5) months after Plaintiff complained about Mr. Pitcher's discriminatory and harassing behavior, Defendant summarily fired Plaintiff on May 4, 2021.

170.     Defendant disciplined and took negative employment actions against Plaintiff because of her complaints of disability discrimination, in violation of the ADA.

171.     Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of her complaint of discrimination and a hostile work environment.

172.     Plaintiff suffered damages as a result of Defendant's unlawful retaliatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

173.     Defendant intentionally violated Plaintiff's rights under the ADA with malice or reckless indifference and, as a result, is liable for punitive damages.

**<u>COUNT IV</u>**
*(Sexual Harassment, Gender Discrimination, and Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2)*

174.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

175.     Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII") by subjecting Plaintiff to sexual harassment, gender discrimination, and a sexually hostile work environment during the course of her employment with BD.

176.     In fall 2019, Ms. Campbell met her new immediate supervisor, Joseph Pitcher ("Mr. Pitcher"). Almost immediately, Mr. Pitcher began paying extra attention to her.

177.     Other employees noticed the number of one-on-one "drive along" meetings that Mr. Pitcher conducted with Ms. Campbell. Mr. Pitcher increased the number of one-on-one meetings with Ms. Campbell and ignored the rest of his staff.

178.     Ms. Campbell faced comments regarding Mr. Pitcher's clear habit of exhibiting favoritism among the team and clear preference for specific representatives over others, and that Mr. Pitcher's bullying was obvious and palpable favoritism.

179.     Mr. Pitcher made inappropriate and sexual comments to Ms. Campbell, including, but not limited to:

          a.     during the October 2019 dinner event where Mr. Pitcher and Ms. Campbell met for the first time, Mr. Pitcher leaned into Ms. Campbell at the bar and whispered in her ear in a predatory and sexual manner;

          b.     often making inappropriate comments to Ms. Campbell regarding her appearance, and sometimes doing so publicly, such as telling Ms. Campbell "you look hot" while he was drunk at a conference;

          c.     openly discussing Ms. Campbell's vacation to Tulum, Mexico, and insinuating that Ms. Campbell partied and did illegal drugs while vacationing with her family; and

          d.     talking to Ms. Campbell about his sex life and lack of sex with his wife.

180.     Mr. Pitcher received photos of Ms. Campbell in a bikini from one of Ms. Campbell's former colleagues before she met Mr. Pitcher for the first time. Mr. Pitcher also participated with other BD employees in circulating Ms. Campbell's bikini photos and making sexual comments regarding the same.

181.     Additionally, Mr. Pitcher intentionally booked a room across from Ms. Campbell's at a conference in 2019 so that he could be closer to her.

182.     When Ms. Campbell did not reciprocate, Mr. Pitcher began treating her poorly.

27

183.     On December 10, 2020, Ms. Campbell alerted and complained to Crystal Barlow ("Ms. Barlow"), BD's HR Advisor, about the abusive behavior and sexual harassment that she faced on a weekly, if not daily, basis from Mr. Pitcher. Ms. Campbell also informed Ms. Barlow about the bikini photos and detailed Mr. Pitcher's behavior toward her, making clear she believed this behavior was sexual harassment.

184.     Ms. Campbell was never contacted or interviewed as part of an investigation into her complaints. Ms. Campbell had to follow-up herself with HR to learn the outcome of her complaint.

185.     Upon information and belief, Defendant never investigated Ms. Campbell's complaint regarding Mr. Pitcher's discrimination and harassment.

186.     Despite alerting HR, nothing was done regarding Mr. Pitcher's behavior and Ms. Campbell continued to face Mr. Pitcher's unwanted, unprofessional, and harassing behaviors.

187.     Ms. Campbell was merely told, by Laurie McGlone, that the bikini photos were "being taken care of" and that Mr. Pitcher "had been addressed," but she was not given any additional information.

188.     As a result of this unlawful discrimination, Ms. Campbell has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career damage, personal and professional embarrassment and humiliation, emotional pain and suffering, and a loss of the enjoyment of life.

## **COUNT V**
*(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.)*

189.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

28

190.     Plaintiff objected to Defendant's hostile work environment, discriminatory treatment of her because of her gender, and sexual harassment.

191.     On December 10, 2020, Ms. Campbell alerted HR about the sexual harassment that she faced on a weekly, if not daily, basis. Ms. Campbell filed a complaint with HR regarding Mr. Pitcher's treatment of her and asked to be transferred to a different manager, ideally, but if that was not possible, for assistance with her need for accommodations, such as intervention with Mr. Pitcher to discuss accommodations and changes in supervisory methods.

192.     Ms. Campbell was never interviewed as part of an investigation into her complaints.

193.     Upon information and belief, Defendant never investigated Ms. Campbell's complaint regarding Mr. Pitcher's discrimination and harassment.

194.     Despite alerting HR, nothing was done regarding Mr. Pitcher's behavior and Ms. Campbell continued to face Mr. Pitcher's unwanted, unprofessional, and harassing behaviors.

195.     Ms. Campbell was merely told, by Laurie McGlone, that the bikini photos were "being taken care of" and that Mr. Pitcher "had been addressed," but she was not given any additional information.

196.     Instead, following Ms. Campbell's December 2020 complaint to HR, Mr. Pitcher's behavior toward her not only continued, but worsened.

197.     Defendant violated Title VII by retaliating against Ms. Campbell for not responding positively to Mr. Pitcher's sexual advancements and harassment and for complaining to HR about sexual harassment during the course of her employment with BD by changing the conditions of her employment and ultimately terminating her.

198.    Examples of Defendant and Mr. Pitcher's retaliatory conduct include, but are not limited to:

a.    Just a few months after Ms. Campbell made an official complaint to HR regarding the bikini photos and Mr. Pitcher's harassing behavior, Mr. Pitcher responded with adverse employment action.

b.    Despite excellent job performance and pleas to HR for disability accommodations and help mitigating Mr. Pitcher's harassment, Ms. Campbell was placed on a PIP with unrealistic expectations, in retaliation for exercising her rights to take FMLA leave and to request reasonable accommodations for her disabilities.

c.    Ms. Campbell was placed on a PIP for nonperformance in March 2021, based on numerous inaccurate statements. She was placed on the PIP just one month after ranking higher in performance than her team and her supervisor, Mr. Pitcher. None of her teammates that were performing below her were placed on a PIP and many are still employed by BD. For example, Ms. Campbell was penalized for not following BD's PTO policy when she was out of work due to her mother's cancer in February 2021. Ms. Campbell did in fact follow BD's PTO policy. Plaintiff did not send a February 23, 2021 email regarding traveling while on PTO, as alleged in the PIP. Plaintiff did in fact let Mr. Pitcher know that she needed to use her PTO, in accordance with BD's PTO policy. She also let other teammates know. The need to take leave was urgent as her mother had been diagnosed with cancer and it was progressing. Mr. Pitcher pushed back on Ms. Campbell and told her that she needed to apply for FLMA or personal leave; however, BD's PTO policy stated that she was free to use PTO for whatever purposes she wanted. At the time, Ms. Campbell had more than enough PTO (280 hours). Regardless, the allegation is that

she did not request PTO; however, Ms. Campbell did, and this could be verified by reviewing Mr. Pitcher's emails during that time. To Ms. Campbell's knowledge, Mr. Pitcher never questioned anyone else's use of PTO or required that they justify taking time off. To Ms. Campbell's knowledge, Mr. Pitcher did not make inaccurate statements on any performance-related documents for anyone else on her team.

        d.     In Ms. Campbell's March 2021  PIP, she was required to sell a $45,000 piece of equipment in order to keep her job. At the time the PIP was issued, no one on Ms. Campbell's team had sold this device and there was no BD requirement to sell this device as part of Ms. Campbell or her team's sales quota. No one on Ms. Campbell's team was required to sell this equipment. Yet Ms. Campbell was required to sell this equipment or lose her job.

        e.     Ms. Campbell was reprimanded for missing a conference call that was scheduled at the last minute. While Ms. Campbell was reprimanded by Mr. Pitcher, her colleague, Renee Andwood, RN, who also missed the call, was not.

199.    Plaintiff was retaliated against for engaging in protected activity by objecting to and complaining of sex discrimination and sexual harassment. As a direct and proximate result of Defendant's unlawful and retaliatory termination, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress.

## **COUNT VI**
*(Retaliation in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(2))*

200.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

201.    Plaintiff is a "person" and an eligible "employee" as defined by 29 U.S.C. § 2611(2)(A).

202.    Defendant is an "employer" as defined by 29 U.S.C. § 2611(4)(A).

203.    Plaintiff had a right under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2612(a)(1), to twelve workweeks of leave during any twelve-month period for family and health-related matters.

204.    During the course of her employment, Ms. Campbell suffered from serious health conditions and exercised her rights under the FMLA, including, but not limited to, taking leave from July 2020 through October 2020.

205.    At all relevant times, Ms. Campbell was in communication with Defendant about the need to take leave under the FMLA due to her medical conditions and above-stated disabilities.

206.    At all relevant times, Defendant had a duty under the FMLA to not retaliate against Ms. Campbell for exercising or attempting to exercise her rights under the FMLA.

207.    Plaintiff was qualified for her position and had performed her job duties effectively prior to the acts complained of herein.

208.    Plaintiff suffered an adverse employment action when she was placed on a PIP and subsequently terminated by Defendant.

209.    Defendant's disparate treatment of Ms. Campbell began just days after she returned to work from job-protected FMLA leave.

210.    Upon Ms. Campbell's return, Mr. Pitcher resumed berating her about her performance, reprimanding her verbally and in writing.

211.    Defendant terminated Plaintiff because she took protected action in the form of FMLA leave to which she was entitled.

212.     As a direct result of Ms. Campbell taking protected action by requesting, and taking, FMLA leave, Defendant retaliated against her by terminating Ms. Campbell's employment after over a decade of faithful work, all with above average performance reviews prior the retaliation alleged throughout.

213.     Defendant's conduct constitutes unlawful retaliation of Plaintiff in violation of Ms. Campbell's rights under the FMLA, 29 U.S.C. § 2615(a).

214.     In discharging Ms. Campbell, Defendant willfully violated the FMLA, 29 U.S.C. § 2615.

215.     Ms. Campbell has suffered and continues to suffer substantial losses, including past and future lost wages and benefits, as a result of Defendant's unlawful actions.

216.     As a result of Defendant's violations of the FMLA, Ms. Campbell is entitled to economic damages, liquidated damages, and reasonable costs and attorneys' fees under the FMLA.

## **COUNT VII**
*(Interference in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1))*

217.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

218.     Plaintiff is a "person" and an "employee" as defined by 29 U.S.C. § 2611(2)(A).

219.     Defendant is an "employer" as defined by 29 U.S.C. § 2611(4)(A).

220.     Ms. Campbell had a right under the FMLA, 29 U.S.C. § 2612(a)(1), to twelve workweeks of leave during any twelve-month period for family and health-related matters.

221.    During the course of her employment, Ms. Campbell suffered from serious health conditions and exercised her rights under the FMLA, including, but not limited to, taking leave from July 2020 to October 2020.

222.    At all relevant times, Ms. Campbell was in communication with Defendant about the need to take leave under the FMLA due to her medical conditions.

223.    At all relevant times, Defendant had a duty under the FMLA to not interfere with Ms. Campbell's rights under the FMLA.

224.    Defendant's actions foreclosed Ms. Campbell's rights under the FMLA, including but not limited to the right to be returned to her position and to be free from threats and harassment for exercising her rights under the law.

225.    Defendant interfered with Ms. Campbell's rights under the FMLA, 29 C.F.R. § 825.220(c), when it  used her FMLA leave as a negative factor in employment actions, including, but not limited to, disciplinary actions such as placing her on a baseless PIP and ultimately terminating her employment just a few months after she returned from leave.

226.    Defendant terminated Plaintiff's employment because she exercised her right to take job protected leave under the FMLA interfering with Ms. Campbell's rights under the FMLA.

227.    Ms. Campbell has suffered and continues to suffer substantial losses, including past and future lost wages and benefits, as a result of Defendant's unlawful actions.

228.    As a result of Defendant's violations of the FMLA, Ms. Campbell is entitled to economic damages, liquidated damages, and reasonable costs and attorneys' fees under the FMLA.

## COUNT VIII

*(Failure to Accommodate and Disability Discrimination/Harassment – Maryland Fair Employment Practices Act, Md. Code, Lab. & Empl. § 20-601, et seq. and Md. Code, State Gov't § 20-601, et seq.)*

229.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

230.     Plaintiff was an "employee" of Defendant within the definition set forth at Md. Code, State Gov't § 20-601(c)(1)(i).

231.     Defendant is an "employer" within the definition set forth at Md. Code, State Gov't § 20-601(d)(1)(i).

232.     Plaintiff has a "disability" within the definition set forth at Md. Code, State Gov't §§ 20-601(b), 20-609(b), as Ms. Campbell suffers from ADHD, complex PTSD, GAD, insomnia, and major depression, and they substantially limit one or more of Plaintiff's major life activities.

233.     Ms. Campbell sought reasonable accommodations, including in April 2020, May 2020, July 2020, October 2020, December 2020, March 2021, and post-March 2021, due to her disabilities. Defendant failed to engage in the interactive process and reasonably accommodate Ms. Campbell.

234.     By the conduct described above, Defendant discharged and otherwise discriminated against Ms. Campbell with respect to her compensation, terms, conditions, and privileges of employment because of her disabilities that precluded the performance of her position.

235.     Defendant's discrimination constitutes an unlawful employment practice under the Maryland Fair Employment Practices Act ("FEPA"), Md. Code, State Gov't § 20-606, which

35

prohibits employers from discriminating against qualified employees who suffer from a disability.

## COUNT IX

*(Sex Discrimination and Harassment – Maryland Fair Employment Practices Act, Md. Code, Lab. & Empl. § 20-601, et seq. and Md. Code, State Gov't § 20-601, et seq.)*

236.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

237.    Plaintiff was subjected to sex discrimination and sexual harassment in violation of Maryland state law.

238.    The discrimination and harassment which Ms. Campbell was subjected included, but was not limited to, sexually harassing comments, sexually harassing behavior and propositions, and sexually inappropriate touching.

239.    The harassment which Ms. Campbell was subjected to was unwelcome, based on sex, and was so severe or pervasive so that it affected the terms and conditions of her employment.

240.    Ms. Campbell objected to the sexual harassment and requested that it stop. She reported the sexually offensive conduct on multiple occasions.

241.    Defendant failed and refused to take prompt and effective remedial action.

242.    Based on the complaints and the open and obvious nature of the harassing behavior, Defendant had actual and constructive knowledge of the harassment but failed to take prompt and effective remedial action.

243.    All acts of sex discrimination and harassment were done willfully, and with malicious and reckless and callous disregard for Ms. Campbell's state law protected rights, or occurred or continued as a result of Defendant's negligence in managing Mr. Pitcher.

244.    Defendant intentionally or negligently discriminated against Ms. Campbell on the basis of her sex in violation of Maryland state law, Md. Code, State Gov't § 20-601, *et seq*. The actions of Defendant were taken with malice or reckless indifference to the state law protected rights of Ms. Campbell or occurred or continued as a result of BD's negligence in managing Mr. Pitcher.

245.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher toward Ms. Campbell because Mr. Pitcher is an individual who undertook or recommended tangible employment actions affecting Ms. Campbell as a BD employee.

246.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher toward Ms. Campbell because Mr. Pitcher is an individual who directed, supervised, or evaluated the work activities of Ms. Campbell.

247.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher toward Ms. Campbell because the intentional disregard or recklessness or negligence of BD led to the sexual harassment or continuation of sexual harassment of Ms. Campbell by Mr. Pitcher.

248.    Ms. Campbell has suffered, and will continue to suffer, great emotional distress, mental anguish, embarrassment, humiliation, and other injuries and damages as a result of the sexual harassment, sexually offensive conduct and the sexually hostile work environment.

249.    As set forth in detail above, Defendant knew, or should have known, of the sex discrimination and harassment, and Defendant condoned, ratified, and otherwise allowed the sexually discriminatory and harassing behavior to continue.

250.    Plaintiff's damages were a proximate result of these violations, which were caused or permitted by Defendant's policy or custom to allow and condone sex discrimination in deliberate indifference to the rights of Ms. Campbell.

251.    Plaintiff has satisfied all administrative prerequisites to bringing her Maryland state law claims.

252.    Defendant's conduct and/or negligence and Mr. Pitcher's conduct violate Maryland state law, Md. Code, State Gov't § 20-601, *et seq*., and specifically § 20-606, for which Defendant is liable pursuant to § 20-611.

253.    By reason of the aforesaid unlawful acts of sexual harassment and discrimination, Plaintiff is entitled to all legal and equitable remedies available under Maryland state law, including, but not limited to, compensatory damages for mental anguish and emotional distress, and punitive damages.

## <u>COUNT X</u>
*(Hostile Work Environment – Maryland Fair Employment Practices Act, Md. Code, Lab. & Empl. § 20-601, et seq. and Md. Code, State Gov't § 20-601, et seq.)*

254.    Defendant intentionally discriminated against Plaintiff on the basis of her gender, in violation of Md. Code, State Gov't § 20-601, *et seq*., condoned and tolerated sexual harassment, and its actions and inactions and negligence created, nurtured, tolerated, condoned, or otherwise permitted a sexually hostile work environment in violation of Maryland state law.

255.    Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (*e.g.*, hiring and firing, promotion and demotion, and reassignments) **or** directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment

decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

256.    The actions of Defendant, and those of its agent Mr. Pitcher, were taken with malice or reckless indifference and/or were permitted to occur due to the negligence of BD in violation of the state law protected rights of Ms. Campbell.

257.    Ms. Campbell was discriminated against by Defendant in the terms, conditions, and privileges of her employment through the creation and toleration of a sexually charged and hostile work environment, or due to the creation and maintenance of a sexually charged and hostile work environment which occurred due to Defendant's negligence.

258.    Ms. Campbell was subjected to a sexually hostile work environment which was authorized, ratified, encouraged and condoned by Defendant, or which occurred due to Defendant's negligence.

259.    Mr. Pitcher's conduct as alleged above and herein was severe, was pervasive, and changed the terms and conditions of employment for Ms. Campbell, and maintained a sexually offensive environment that no reasonable woman would be willing to endure.

260.    Based on the totality of the circumstances, Mr. Pitcher's conduct created a working environment that a reasonable person would perceive to be abusive or hostile.

261.    Ms. Campbell's rejection of Mr. Pitcher's conduct was used as a basis for employment decisions affecting her in violation of Md. Code, State Gov't § 20-601(k).

262.    As a result of ignoring, and thereby condoning, the inappropriate and unwelcome conduct toward Ms. Campbell, Defendant forced Ms. Campbell to work in a sexually hostile work environment. Defendant's failure to take any steps to stop Mr. Pitcher's behavior amounted to a condonation, ratification, and approval of such conduct, and permitted its perpetuation.

263.    By condoning, and perpetuating a sexually hostile work environment, Defendant intentionally and with reckless indifference and disregard violated Md. Code, State Gov't § 20-606.

264.    This sexually hostile work environment included, but was not limited to, sexual comments and sexual advances, threats to and actions against Plaintiff's terms and conditions employment, and other disparate treatment by which Plaintiff, because she is a woman, was treated in an inferior and deleterious manner.

265.    The sexually hostile environment altered the terms and conditions of Ms. Campbell's employment.

266.    Supervisors and management and other officials of Defendant participated in, were aware of, encouraged, and/or condoned and tolerated, or negligently allowed to be created, occur, or be maintained the sexually hostile work environment to which Ms. Campbell was exposed for a prolonged period of time.

267.    Plaintiff reported the sexually hostile work environment to Defendant, and Defendant had actual knowledge of the sexually hostile work environment, yet Defendant did not take appropriate steps to alleviate the workplace environment or to protect Ms. Campbell, or Defendant, through its negligence took inadequate steps to alleviate such workplace environment or to protect Ms. Campbell.

268.    Defendant failed to train, or negligently trained, its employees, supervisors, and managers regarding its purported anti-harassment policies and reporting procedures.

269.    Ms. Campbell was directly affected by the sexually discriminatory and harassing practices, and the sexually hostile work environment, at the workplace.

270.    Ms. Campbell made good faith complaints in opposition to the sexual discrimination and harassment and the sexually hostile work environment to which she was subjected.

271.    The conduct of BD's agent, Mr. Pitcher, was so severe and pervasive as to create a sexually hostile working environment for Ms. Campbell, which BD's negligence allowed to be created, occur or be maintained.

272.    The Defendant knew, or should have known, of the sexually hostile work environment to which Ms. Campbell was subjected.

273.    The Defendant failed, intentionally or negligently, to take prompt and effective action reasonably calculated to result in the prevention of and/or to remedy the sexually hostile work environment.

274.    Defendant's conduct and/or negligence and Mr. Pitcher's conduct in creating and maintaining a sexually hostile work environment to which Ms. Campbell was subjected for a prolonged period of time violate Maryland state law, Md. Code, State Gov't § 20-601, *et seq*., and specifically § 20-606, for which Defendant is liable pursuant to § 20-611.

275.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher in creating and maintaining a sexually hostile work environment to which Ms. Campbell was subjected for a prolonged period of time because Mr. Pitcher is an individual who undertook or recommended tangible employment actions affecting Plaintiff as a BD employee.

276.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher in creating and maintaining a sexually hostile work environment to which Ms. Campbell was subjected for a prolonged period of time

because Mr. Pitcher is an individual who directed, supervised, or evaluated the work activities of Plaintiff.

277.    As a proximate consequence of Defendant's actions, under Md. Code, State Gov't § 20-611, Defendant is liable for the acts of Mr. Pitcher in creating and maintaining a sexually hostile work environment to which Ms. Campbell was subjected for a prolonged period of time because the intentional disregard or recklessness or negligence of Defendant led to the sexual harassment or continuation of sexual harassment of Plaintiff by Mr. Pitcher.

278.    Plaintiff's damages were a proximate result of these violations, which were caused or permitted by Defendant's policy, custom, or negligence, to allow and condone a sexually hostile work environment in deliberate indifference to the rights of Plaintiff.

279.    Plaintiff has satisfied all administrative prerequisites to bringing her Maryland state law claims.

280.    By reason of the aforesaid unlawful sexually hostile work environment, the Plaintiff is entitled to all legal and equitable remedies available under Maryland state law, including, but not limited to, compensatory damages for mental anguish and emotional distress, and punitive damages.

## COUNT XI
*(Retaliation – Maryland Fair Employment Practices Act, Md. Code, Lab. & Empl. § 20-601, et seq. and Md. Code, State Gov't § 20-601, et seq.)*

281.    Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

282.    FEPA prohibits employers from punishing employees who complain about being denied employment opportunities because of their disability and for taking protected medical leave. Md. Code, State Gov't § 20-606.

283.     Plaintiff's complaints to Defendant regarding disability discrimination, hostile work environment, and sexual harassment, and her taking medical leave from July 2020 until October 2020, amounted to legally protected activities.

284.     The subsequent adverse employment actions in continuing to deny Plaintiff opportunities and in terminating Plaintiff's employment were carried out as a means of retaliating against Plaintiff for engaging in legally protected activities and to discourage other employees from engaging in the same or similar protected activities, and therefore violates the anti-retaliation provisions of FEPA.

285.     Defendant's retaliatory actions have caused and continue to cause Plaintiff to suffer lost wages and benefits, emotional distress, inconvenience, mental anguish, and loss of enjoyment of life, and have caused Plaintiff to incur attorneys' fees and court costs.

286.     Due to Defendant's violation of Maryland law, Plaintiff is entitled to compensatory damages, including back pay under Md. Code, State Gov't § 20-1009, as well as damages for emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

287.     Defendant's discriminatory and retaliatory actions against Plaintiff in violation of FEPA were carried out with malice or reckless indifference to the rights of Plaintiff, thereby entitling her to an award of punitive damages under Md. Code, State Gov't § 20-1013(e).

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.

## PRAYER FOR RELIEF

While reserving the right to seek additional damages and plead additional causes of action as available, Plaintiff demands judgment against Defendant as follows:

1. On all applicable causes of action, back pay and benefits plus compensatory damages in an amount to be determined at trial;

2. On all applicable causes of action, an award of punitive damages in an amount to be determined at trial;

3. An award Plaintiff liquidated damages pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2617 in an amount to be proven at trial;

4. An award Plaintiff all costs and disbursements of this action, including reasonable attorneys' fees; and

5. Grant Plaintiff any other further relief the Court may deem just and proper.

Dated: November 23, 2022                     Respectfully submitted,

                                             /s/ Roya Vasseghi
                                             _____
                                             Roya Vasseghi (MD Bar # 1812070012)
                                             VASSEGHI BUDD PLLC
                                             9663-A Main Street
                                             Fairfax, VA 22031
                                             (703) 215-9358 Tel.
                                             (703) 563-7401 Fax
                                             roya@vasseghibuddlaw.com

                                             *Counsel for Plaintiff Sonya Campbell*