IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SONYA CAMPBELL,

    *Plaintiff*,

v.

BECTON, DICKINSON AND
COMPANY,

    *Defendant*.

Civil No. 1:22-cv-03043-ELH

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Sonya Campbell, a woman with several disabilities, asserts a host of employment discrimination claims against her former employer, defendant Becton, Dickinson and Company ("BD" or "Becton"). ECF 1 (Complaint); ECF 19 (Amended Complaint). The Amended Complaint, which is the operative pleading, includes a copy of the Charge of Discrimination ("Charge") dated August 5, 2021, filed by plaintiff with the Equal Employment Opportunity Commission ("EEOC"). ECF 19-2.

The Amended Complaint contains fourteen counts for relief. The claims are predicated on Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*; Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and the Maryland Fair Employment Practices Act (the "MFEPA"), Maryland Code (2020 Repl. Vol., 2022 Supp.), § 20-601 of the State Government Article ("S.G."). In particular, Count I alleges a failure to provide reasonable accommodation, in violation of the ADA (*id.* ¶¶ 136–55); Count II alleges disparate treatment, in violation of the ADA (*id.* ¶¶ 156–76); Count III alleges disparate treatment/wrongful discharge, in violation of the ADA (*id.* ¶¶ 177–94); Count IV alleges retaliation, in violation of the ADA (*id.* ¶¶ 195–213); Count V alleges sexual harassment, in

violation of Title VII (*id.* ¶¶ 214–30); Count VI alleges gender discrimination, in violation of Title VII (*id.* ¶¶ 231–39); Count VII alleges hostile work environment, in violation of Title VII (*id.* ¶¶ 240–52); Count VIII alleges retaliation, in violation of Title VII (*id.* ¶¶ 253–67); Count IX alleges retaliation, in violation of the FMLA (*id.* ¶¶ 268–93); Count X alleges interference, in violation of the FMLA (*id.* ¶¶ 294–310); Count XI alleges failure to accommodate and disability discrimination/harassment, in violation of the MFEPA (*id.* ¶¶ 311–21); Count XII alleges sex discrimination and harassment, in violation of the MFEPA (*id.* ¶¶ 322–39); Count XIII alleges hostile work environment, in violation of the MFEPA (*id.* ¶¶ 340–66); and Count XIV alleges retaliation, in violation of the MFEPA (*id.* ¶¶ 367–75).

Defendant has filed a "Motion for Partial Dismissal of Plaintiff's Amended Complaint" (ECF 20), supported by a memorandum (ECF 20-1) (collectively, the "Motion") and one exhibit. ECF 20-2.  In the Motion, Becton seeks dismissal of Counts I, IV, V, VII, VIII, X, XI, and XIV. ECF 20-1 at 2–3.  Plaintiff opposes the Motion.  ECF 21 (the "Opposition").  Defendant replied. ECF 22 (the "Reply").  In the Reply, defendant states that, "at this time," it "withdraws its request" to dismiss Count X.  *Id.* at 1 n.1.  Accordingly, Counts I, IV, V, VII, VIII, XI, and XIV are the only counts at issue.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

# I. Factual Summary[1]

Becton is a "global medical technology company" which "employs more than 75,000 employees nationwide." ECF 19, ¶ 3. Although Becton is headquartered in New Jersey, it "is registered and authorized to do business in the State of Maryland . . . ." *Id.*

Campbell is a disabled woman. *Id.* ¶ 2. Her disabilities include "complex post-traumatic stress disorder ('PTSD') stemming from abuse she endured as a minor, attention-deficit/hyperactivity disorder ('ADHD'), insomnia, generalized anxiety disorder ('GAD'), and major depression." *Id.* ¶ 42. Plaintiff alleges that, despite her disabilities, she "is a highly qualified and experienced senior sales representative with expertise in medical devices." *Id.* ¶ 14.

The suit is rooted in plaintiff's employment as a sales representative for Becton during the period when she reported to Becton's sales manager, Joseph Pitcher. Pitcher became plaintiff's manager in October 2019. *Id.* ¶ 26. Becton terminated plaintiff on May 4, 2021. *Id.* ¶ 132.

Plaintiff traces her employment with Becton to 2010, when she "worked as a Sales Consultant for CareFusion . . . where she excelled in her position." *Id.* ¶ 15. Becton acquired CareFusion in 2015 (*id.* ¶ 16), and plaintiff became an employee of Becton. *Id.* ¶ 18. By the time of plaintiff's termination on May 4, 2021, plaintiff had "over fifteen years of experience in the industry." *Id.* ¶ 24. Moreover, she "had an outstanding track record of over eleven years of employment with no negative performance evaluation and numerous awards and recognition for her work." *Id.* ¶ 25. During her time at Becton, plaintiff claims that she "continued to outperform her peers and move up." *Id.* ¶ 17.

---

[1] As discussed, *infra*, given the posture of the case, I must assume the truth of plaintiff's factual allegations.

In December 2017, Becton acquired C.R. Bard, Inc. ("Bard"). *Id.* ¶ 19.  Pitcher is "a former Bard employee . . . ." *Id.* ¶ 26.  Plaintiff's team was reorganized in 2019, and consisted of many Bard employees.  *Id.* ¶ 20.  Plaintiff was placed in a newly created business unit, "BD Peripheral Intervention."[2] *Id.*  She was assigned to the "Peripheral Intervention–Oncology sales team." *Id.* ¶ 22.  And, "as part of the reorganization," she "was given the title of Senior Territory Manager, due to her tenure and performance." *Id.* ¶ 23.

Campbell contends that "[f]rom 2015 to 2019, [she] worked as a Sales Consultant at BD without issue or disciplinary action." *Id.* ¶ 18.  In the fall of 2019, plaintiff "met her new team and her new immediate supervisor," Joseph Pitcher, "a relatively new and inexperienced sales manager." *Id.* ¶ 26.  As indicated, Pitcher became plaintiff's "manager" on October 1, 2019.  *Id.*; ECF 20-1 at 4.  When Campbell met her new team in the fall of 2019, she "alerted her supervisor, Mr. Pitcher, human resources ('HR'), and other management representatives of BD of her disabilities."  ECF 19, ¶ 140.

According to plaintiff, "Mr. Pitcher almost immediately began paying extra attention to [her]."  *Id.* ¶ 27.  In October 2019, when plaintiff met Pitcher for the first time, "Pitcher leaned into Ms. Campbell at the bar and whispered in her ear, 'I've met you before,' in a predatory and sexual manner, making Ms. Campbell extremely uncomfortable."  *Id.*  Plaintiff "subsequently learned from a colleague that a former colleague had sent Mr. Pitcher and other colleagues photos of her in a bikini before she met Mr. Pitcher for the first time."  *Id.* ¶ 28.

Then, at an overnight conference in November 2019, Pitcher's hotel room was located "across the hall from Ms. Campbell."  *Id.* ¶ 29.  Because "Ms. Campbell had attended numerous conferences before, and her colleagues' rooms were never near hers," she "felt like Mr. Pitcher

---

[2] Plaintiff does not describe the work of the "BD Peripheral Intervention" unit.

4

was intentionally trying to be alone with her." *Id.* Additionally, "[a]t the National Sales Meeting in Las Vegas, Mr. Pitcher made comments regarding Ms. Campbell's appearance and dress in front of their team." *Id.* ¶ 30.

Plaintiff asserts that "Mr. Pitcher often made inappropriate comments to Ms. Campbell regarding her appearance and sometimes did so publicly." *Id.* ¶ 33. On one occasion, "at a conference dinner with several other Bard colleagues, Mr. Pitcher told Ms. Campbell, 'you look hot' while he was visibly intoxicated." *Id.* Additionally, Pitcher made comments with "implications that made Ms. Campbell feel very uncomfortable as a woman." *Id.* ¶ 37. These included telling her to "'make it happen' and 'do whatever it takes' to sell and close customers, all of whom were male." *Id.*

Pitcher also engaged in inappropriate "behavior." *Id.* ¶ 34. For example, Pitcher "constantly sent emails, text messages, and made phone calls criticizing and shaming Ms. Campbell, all of which were unrelated to her performance at BD, and constantly berated Ms. Campbell in response to Ms. Campbell not reciprocating." *Id.* ¶ 36. These "nonstop actions severely exacerbated Ms. Campbell's [PTSD] and caused her to experience severe PTSD symptoms." *Id.* Plaintiff alleges that "Mr. Pitcher became erratic and demanding with Ms. Campbell during the height of the pandemic—March through June 2020—when elective procedures ceased, and her customers were suffering financially." *Id.* ¶ 39. He "constantly berated [her], despite her record as a high-performing employee." *Id.*

Then, "during a field ride in early 2020, when Ms. Campbell returned from a vacation in Mexico with her family, Mr. Pitcher launched into an inappropriate discussion with her regarding . . . recreational drug use." *Id.* ¶ 34. Plaintiff felt "uncomfortable." *Id.* Although she "did not encourage further conversation," Pitcher "continued to press on the subject." *Id.* On another ride-

along during the pandemic, "Mr. Pitcher expressed how relieved he was that he was recovered from COVID-19 and could get 'back into the bedroom,'" stating that "'it's been a long year,' implying that he and his wife had not had sex or been intimate for a year." *Id.* ¶ 41.  According to plaintiff, Pitcher "was relentless and continued to sexually harass Ms. Campbell and make her feel uncomfortable." *Id.* ¶ 35.

Campbell asserts: "Despite her years of experience and high-ranking sales, Mr. Pitcher singled [her] out for extra monitoring, extra one-on-one time, and extra ride-alongs." *Id.* ¶ 32. Yet, plaintiff alleges that "Mr. Pitcher did not do so with the other sales representatives . . . ." *Id.* And, "at least one colleague mentioned that she believed Mr. Pitcher singled Ms. Campbell out for ride-alongs because he was attracted to Ms. Campbell." *Id.*

In spring 2020, as the COVID-19 pandemic "was picking up steam, Ms. Campbell's mental health began to suffer." *Id.* ¶ 38.  "Mr. Pitcher's behavior and unwanted attention, sometimes threatening and always relentless, began to interfere with Ms. Campbell's ability to perform her job." *Id.* ¶ 40.  Although plaintiff "felt extremely uncomfortable being around Mr. Pitcher," she "did not feel like she could complain about his comments to BD Management or [HR] because she believed that she would be retaliated against." *Id.* ¶ 31.

Plaintiff asserts that, "[p]rior to working under Mr. Pitcher's supervision," she "had requested an accommodation for her insomnia." *Id.* ¶ 44.  And, when she began working with Mr. Pitcher, "she alerted him to her accommodation for her insomnia," *id.* ¶ 45, consistent with BD policy, which "requires that an employee first reach out to their direct manager for an accommodation request." *Id.* ¶ 46.  Although plaintiff was taking several medications, "including medications for her insomnia that affected her alertness in the morning," *id.* ¶ 47, Pitcher "insisted

on early morning meetings and often berated Ms. Campbell if she did not give rapid-fire answers to his questions." *Id.* ¶ 48.

In late April 2020, Campbell asked Pitcher for a meeting "to discuss accommodations." *Id.* ¶ 49. At the meeting, held in May 2020, Campbell notified Pitcher that "the start time of their meetings was problematic for her due to the side effects of her insomnia medication." *Id.* ¶ 50. In response, "Pitcher not only refused this reasonable accommodation but intimidated and ridiculed [plaintiff] for requesting the accommodation in the first place." *Id.* ¶ 51. As a result, "Ms. Campbell was discouraged from seeking accommodations or exercising her rights under state and federal laws relating to disability protections." *Id.* ¶ 52.

Although "Ms. Campbell's accommodation request was for a later start time and not mental health treatment, BD later directed Ms. Campbell to an Employee Assistance Program ('EAP')." *Id.* ¶ 53. Campbell "reached out to the EAP for assistance," but she was "unable to meet with a mental health provider because of the increased demand caused by the COVID-19 pandemic." *Id.* ¶ 54. When she "subsequently met with a psychologist," she "was forced to pay for this treatment out of her own pocket." *Id.* ¶ 55. Thus, "BD failed to provide Ms. Campbell with reasonable accommodations and further failed to even begin to engage in the interactive process with her." *Id.* ¶ 56.

Campbell asserts that after she "revealed her mental health issues" to Pitcher, his "behavior became increasingly aggressive toward [her] . . . ." *Id.* ¶ 57.[3] This triggered plaintiff's PTSD. *Id.*

Pitcher "showed his disdain for mental health and mental disabilities in other ways during Ms. Campbell's employment." *Id.* ¶ 58. To illustrate, on one occasion, "Mr. Pitcher 'joked' with

---

[3] In this section of the suit, plaintiff never actually asserts that she disclosed mental health issues. Indeed, she claims that she did not seek an accommodation for mental health treatment. ECF 19, ¶ 53. So, it is not clear what she "revealed," other than her insomnia.

Ms. Campbell regarding another sales representative, Eric Rudiak, who committed suicide in early 2020." *Id.* ¶ 59.  Shortly following Mr. Rudiak's death, "Mr. Pitcher stated to Ms. Campbell that Mr. Rudiak 'should have just gotten another job.'"  *Id.*  Plaintiff was "appalled" by the comment, and she "replied stating that Mr. Rudiak should have stopped working and used his medical leave because that was the intended purpose of the leave."  *Id.* ¶ 60.  Further, "[a]lthough Mr. Pitcher tried to joke about Mr. Rudiak's suicide with Ms. Campbell, she protested at his inappropriate 'humor' and complete lack of empathy towards her former colleague," and "let Mr. Pitcher know that Mr. Rudiak's suicide and previous mental health struggles were serious matters."  *Id.* ¶ 62.

Given that Pitcher was plaintiff's "direct supervisor," his comments regarding Rudiak upset Campbell.  *Id.* ¶ 60.  Specifically, plaintiff "felt that if Mr. Pitcher thought that mental health struggles, including being suicidal, did not justify taking leave, Mr. Pitcher certainly would not understand her PTSD, ADHD, insomnia, GAD, or major depression."  *Id.* ¶ 61.

Moreover, plaintiff contends that Pitcher "made several comments throughout the course of [her] employment with BD that made it clear that he had no sympathy for any employee with disabilities, particularly those with mental disabilities."  *Id.* ¶ 99.  She also contends that Pitcher "regularly made sarcastic and discriminatory comments to Ms. Campbell regarding her disabilities."  *Id.* ¶ 163.  For example, "in June 2020, when Ms. Campbell attempted to discuss her need for accommodations, such as later meeting start times to allow for the side effects to subside from her insomnia medications, M[r]. Pitcher responded, 'What, do you want to call HR?'"  *Id.*

Campbell's role as a "Senior Territory manager involved submitting paperwork and responding to a steady stream of customer inquiries," which "can be challenging for an individual with ADHD, as executive functioning struggles are inherent with this disability."  *Id.* ¶ 64.

Following the accommodation meeting in May 2020,[4] discussed previously, Pitcher "became even more demanding and hostile, which exacerbated Ms. Campbell's GAD, ADHD, PTSD, insomnia, and depression symptoms." *Id.* ¶ 65.  Further, "[t]he constant emails, text messages, and phone calls criticizing and shaming Ms. Campbell, which were unrelated to her performance, caused [her] to experience severe PTSD symptoms" and "[a]t times the constant barrage of verbal and written attacks felt like stalking . . . ." *Id.* ¶ 66.

Plaintiff alleges multiple instances where Pitcher criticized her, but not other employees. To illustrate, in July 2020 Campbell "was berated for missing a meeting" while "[a]nother colleague . . . also missed the meeting" but was not berated, nor did Pitcher "even mention the missed meeting to her." *Id.* ¶ 67.  Additionally, "Mr. Pitcher aggressively texted Ms. Campbell until 6:00 pm on a Friday evening regarding a purchase order that did not come in on" the third day "of a new product launch." *Id.* ¶ 68.  At the time of the texts, "Ms. Campbell was the only person on her team who had received a purchase order at all, and this order had actually come in on the first day of the product launch." *Id.*[5]

Also in July 2020, when Campbell took paid-time off ("PTO") after "she had been in close contact" with two people who had tested positive for COVID-19, and "she was not feeling well," *id.* ¶ 70,  Pitcher "scheduled a call with a client and invited Ms. Campbell." *Id.* ¶ 71.  When Campbell did not attend, *id.* ¶ 72, "Mr. Pitcher berated [her] for missing the meeting and told her she should have requested PTO, despite [the fact] that Ms. Campbell had already requested PTO

---

[4] Paragraph 65 of the Amended Complaint refers to an "April 2020" conversation between plaintiff and Pitcher.  ECF 19, ¶ 65.  Elsewhere, plaintiff indicates that she asked to meet with Pitcher in "late April 2020" and met with him in May 2020.  *Id.* ¶¶ 49, 50.

[5] Plaintiff informed Crystal Barlow, BD's HR Advisor, of this incident when she filed her first HR complaint in December 2020.  ECF 19, ¶ 68.

and it had been approved." *Id.* ¶ 73.  Pitcher's actions caused Campbell "stress and increased anxiety," which "worsened [her] ADHD, PTSD, and GAD symptoms and led to more abuse and berating by Mr. Pitcher." *Id.* ¶ 74.

Campbell's "sales numbers exceeded expectations, even amidst a pandemic . . . ." *Id.* ¶ 75.  Nevertheless, "Mr. Pitcher continued to focus on Ms. Campbell and push her to her breaking point." *Id.*  Overall, "Mr. Pitcher held Ms. Campbell to a different standard than her male counterparts as well as those employees without disabilities." *Id.* ¶ 76.  Consequently, in July 2020, Campbell's physician advised her "to take FMLA leave for her mental health issues . . . ." *Id.* ¶ 77.

From July 15, 2020 through October 27, 2020, plaintiff took FMLA leave. *Id.* ¶ 79.[6]  In October 2020, plaintiff "submitted multiple forms and substantiating documents from her physician to BD's third-party benefits provider, Sedgewick, in support of her accommodation request." *Id.* ¶ 80.[7]

On October 26, 2020, Campbell "made another request for reasonable accommodations for her ADHD and PTSD to Defendant through Sedgewick." *Id.* ¶ 145.  Specifically, she alleges that

---

[6] Defendant contends that this constitutes "a period of time in excess of the annual maximum of twelve weeks of unpaid leave available under the FMLA."  ECF 20-1 at 17.

[7] In her Opposition, plaintiff states, ECF 21 at 12:

On October 18, 2020, Ms. Campbell's doctor, John Persampiere, Ph.D. Clinical Psychology at Annapolis Child and Family Therapy Center, submitted BD's Accommodation Substantiation Form, along with his phone number and email, stating that Ms. Campbell would be released to work soon, but with certain accommodations for her ADHD-Combined Type—an executive functioning disorder.  *See* [ECF 19] ¶¶ 80, 145–46.  Dr. Persampiere checked the major life activity boxes for learning, thinking, concentrating, and other (planning and organization, executive functioning challenges).  *Id.*  The Form also included examples of suggested accommodations, such as "increased flexibility" and "increased access to organizational support."  *Id.*

she "clearly stated that she was seeking accommodations relating to her executive functioning deficits," and that she "provided documentation from her physician to support the same." *Id.* ¶ 146.

Sedgewick responded on October 27, 2020, *id.* ¶ 147, indicating that "additional information was needed to clarify her request and specific accommodations and that someone from Sedgewick would be back in touch with her." *Id.* ¶ 81; *see id.* ¶ 147. Although Campbell "attempted to contact Sedgewick again on multiple occasions to straighten out the alleged discrepancy," Campbell "was told that a representative from Sedg[e]wick would contact her and guide her through the process of requesting a reasonable accommodation," which was "a contact that never occurred." *Id.* ¶ 82. This left Campbell feeling "extremely frustrated with how BD and Sedgewick were treating her accommodation request." *Id.*

According to Campbell, she "left multiple messages with Sedgewick to obtain assistance with her accommodation request" but "her calls were not returned and no one from BD or Sedg[e]wick engaged in the interactive process with Ms. Campbell in response to her accommodation request." *Id.* ¶ 83. Nor did anyone from Sedgewick or BD ever get back to Ms. Campbell regarding her request. *Id.* ¶ 84; *see also id.* ¶¶ 87, 148.

Although BD "fail[ed] to respond to Ms. Campbell's request for accommodation, BD requested a statement from Ms. Campbell's doctor which cleared her to return to work." *Id.* ¶ 85. In response, "Ms. Campbell reached out to her physician again, at her own cost, and requested a letter that stated she was able to return to her position at the end of her FMLA leave." *Id.* Thus, "Ms. Campbell provided BD with a letter clearing her to return to work, as directed by BD, solely concerning her FMLA leave." *Id.* ¶ 86.

11

As noted, Campbell returned to work from her FMLA leave in October 2020.  *Id.* ¶ 79.
"Immediately upon her return, Mr. Pitcher resumed hounding [her] about her performance,
reprimanding her verbally and in writing."  *Id.* ¶ 88.  Pitcher "continued to single Ms. Campbell
out and berate her regarding her alleged poor performance, holding her to a different standard than
her colleagues."  *Id.* ¶ 97.  For example, on November 4, 2020, just one week after Campbell
returned to work, Pitcher "told Ms. Campbell that she was not performing up to standard and her
numbers were down, despite her being out on FMLA leave for part of the year."  *Id.* ¶ 89.  And,
"[a] few weeks later, on November 19, 2020, Mr. Pitcher scheduled a field visit with Ms.
Campbell," during which he "berated [her] regarding her performance, holding her to the same
numbers her teammates that had not been on job-protected leave were held to."  *Id.* ¶ 90.

On November 20, 2020, Pitcher "submitted a 'Field Visit Follow Up' memorandum
flagging Ms. Campbell's alleged poor performance in an attempt to paper Ms. Campbell's file in
anticipation of her retaliatory termination."  *Id.* ¶ 91.  Plaintiff takes issue with portions of the
memorandum, claiming that Pitcher "falsely stated that Ms. Campbell's 2020 performance was
lacking, in addition to her 2021 performance."  *Id.* ¶ 96.  She states, for example, that Pitcher
"falsely stated that Ms. Campbell's sales ranking was 52/74 in 2020."  *Id.* ¶ 92.  Rather, Campbell
claims that her "sales ranking was 36/74 nationwide amongst BD's Territory Managers for 2020,"
*id.* ¶ 93, and "[t]he numbers Mr. Pitcher was holding Ms. Campbell to for 2021 were not adjusted
to account for Ms. Campbell's FMLA leave."  *Id.* ¶ 94.  Further, "Mr. Pitcher flagged issues with
Ms. Campbell's sales pipeline, which again was impacted by Ms. Campbell being out on job-
protected FMLA leave."  *Id.* ¶ 95.

Plaintiff asserts: "Despite being out on FMLA leave, Ms. Campbell was still meeting her
sales quotas, based on a full year of work, and surpassing her peers."  *Id.* ¶ 106.  According to

Campbell, she "continued to exceed her sales targets as evidenced by her March 2021 sales rankings." *Id.* ¶ 113. Overall, "Ms. Campbell ranked in the top 50% of Territory Managers nationwide—36/74—for her sales performance," meaning that she "outperformed most of her team, including Mr. Pitcher." *Id.*

Campbell claims that she "was extremely intimidated by Mr. Pitcher and was reluctant to voice her concerns to HR for fear of retaliation." *Id.* ¶ 98. But, plaintiff spoke to HR Advisor Crystal Barlow on December 10, 2020, "detailing Mr. Pitcher's abusive behavior and sexual harassment that she faced on a weekly, if not daily, basis." *Id.* ¶ 100. Further, she told Barlow "about the bikini photos and detailed Mr. Pitcher's behavior toward her, making clear she believed this behavior was sexual harassment." *Id.* Plaintiff "filed her first formal complaint with HR during this conversation . . . ." *Id.* ¶ 102. In response, "Ms. Barlow stated that Mr. Pitcher's actions would warrant a discussion with Mr. Pitcher's supervisor for coaching and that she would speak with her supervisor, Laurie McGlone ('Ms. McGlone'), BD's Senior Employee Relations Advisor, regarding Mr. Pitcher." *Id.* ¶ 103.

During the meeting of December 10, 2020, Campbell "requested to be transferred to a different manager, and if transfer was not possible, to receive assistance with her needs for accommodations and intervention with Mr. Pitcher to discuss accommodations such as changes in supervisory methods." *Id.* ¶ 164. And, plaintiff "again requested assistance for her ADHD and PTSD symptoms." *Id.* ¶ 101; *see also id.* ¶ 150. However, plaintiff alleges that "[n]o one from BD or Sedgewick, including Ms. Barlow, followed up with Ms. Campbell regarding her December 2020 accommodation request." *Id.* ¶ 107; *see also id.* ¶ 151.

According to Campbell, "[t]he very next day, December 11th, Mr. Pitcher singled Ms. Campbell out and met with her regarding her 'poor performance.'" *Id.* ¶ 104. Further, plaintiff

alleges that on December 20, 2020, McGlone told Campbell "that the bikini pictures were 'being taken care of' and that Mr. Pitcher 'had been addressed,' but she did not give Ms. Campbell any additional information." *Id.* ¶ 108. Plaintiff alleges that, "[u]pon information and belief, Mr. Pitcher was made aware of Ms. Campbell's complaint, and this led to his adverse actions" the next day. *Id.* ¶ 105. But, Campbell "was never contacted for an investigation into her sexual harassment complaint, despite Ms. Barlow's previous statement that Mr. Pitcher's actions would warrant action and that she would speak with her supervisor regarding Mr. Pitcher." *Id.* ¶ 109.

Plaintiff asserts: "Mr. Pitcher's behavior toward Ms. Campbell not only continued but worsened after her December 2020 complaint." *Id.* ¶ 110. "For example, on January 4, 2021 . . . Mr. Pitcher emailed Ms. Campbell citing a performance issue that had never been raised before and alleging that a customer contacted him (on December 29, 2020) frantically complaining about Ms. Campbell being unresponsive." *Id.* ¶ 111. Prior to this complaint, "Ms. Campbell had never received such an email from him or any other supervisor." *Id.* ¶ 112. Plaintiff states, *id.*: "Mr. Pitcher began sending these emails in an attempt to paper Ms. Campbell's file."

On March 2, 2021, "Pitcher placed Ms. Campbell on a Performance Improvement Plan ('PIP')." *Id.* ¶ 114. This came "shortly after Ms. Campbell complained to HR regarding Mr. Pitcher's harassing and discriminatory behavior, and requested accommodations for her disabilities . . . ." *Id.*

Campbell reiterates that, at the time, she was ranked in the top 50% of Territory Mangers nationwide. *Id.* ¶ 113. Although plaintiff disagrees with the tabulation of a ranking that did not account for her FMLA leave, *id.* ¶¶ 92, 94, plaintiff claims that even with her four-month leave, her "sales placed her 52/74 among BD Territory Managers nationwide for Fiscal Year 2020," thereby "exceed[ing] a third of her peers who had worked the entire year." *Id.* ¶ 117; *see id.* ¶

124.[8]  And, "[j]ust one week after being placed on a PIP, the Oncology DSR report[9] placed Ms. Campbell at 94.1% YTD performance to quota, making her the third-highest performing member of her eight-person team," thereby "once again outranking Mr. Pitcher."  *Id.* ¶ 118.  This performance was in stark contrast to "the spurious numbers in her PIP wherein Mr. Pitcher claimed that Ms. Campbell ranked 70th out of 74 territory managers in the 2021 Fiscal Year."  *Id.*

Plaintiff alleges: "The PIP contained unreasonable expectations and fabricated allegations."  *Id.* ¶ 116.  Indeed, she avers that although "Ms. Campbell should not have been held to the same standard as her peers given her four-month FMLA leave, she still exceeded these unreasonable expectations."  *Id.*

The PIP provided that, if Campbell failed to meet the PIP's requirements, "she '[would] be subject to disciplinary action, up to and including termination of [her] employment with BD.'"  *Id.* ¶ 115 (alterations in ECF 19).  The PIP was to last 60 days, ending on May 3, 2021, but Campbell was warned that "'it may be terminated early and disciplinary action taken if you do not show immediate and ongoing improvement.'"  *Id.*  Further, the PIP stated that "'a decrease in performance after successfully completing the Plan may also result in termination of your employment, without the issuance of another warning or improvement plan.'"  *Id.*

Further, the PIP "penalized Ms. Campbell for not selling an extremely expensive product, the Gamma Finder 3, and demanded that she do within sixty days to keep her job."  *Id.* ¶ 119.  However, as plaintiff points out, "no team member had sold the product as of March 2, 2021, and the device carries zero quotas for the year, meaning neither Ms. Campbell nor anyone on her team

---

[8] According to the Amended Complaint, "BD's Fiscal Year runs from October 1st through September 30th."  ECF 19, ¶ 123 n.2.

[9] Plaintiff does not define the term "DSR."

was required to sell the product." *Id.*   Yet, the fact that plaintiff did not sell this product "was eventually cited as a reason for her termination." *Id.*

In addition, "the PIP penalized Ms. Campbell for her tardiness and missed deadlines." *Id.* ¶ 120.  But, "[t]hese problems could have been ameliorated if Ms. Campbell had been given the reasonable accommodations that she repeatedly requested." *Id.*   Thus, "[t]he demands detailed in the PIP likewise disregarded Ms. Campbell's known disabilities and her documented need for accommodations." *Id.* ¶ 121.   In one example, "Ms. Campbell was required to meet with Mr. Pitcher weekly at 9:00 a.m. even though he was on notice that the grogginess side effects of Ms. Campbell's insomnia medications made morning meetings difficult for her." *Id.*   And, "the PIP put in place significant time-sensitive demands that were difficult for Ms. Campbell to fulfill without accommodations for her ADHD and PTSD." *Id.*

Because "Mr. Pitcher, BD management, and HR were well aware of Ms. Campbell's disabilities, as well as the tasks that would be difficult for Ms. Campbell to perform without reasonable accommodations, and the fact that she did not have any accommodations," plaintiff asserts that Pitcher "deliberately conditioned Ms. Campbell's job on demands that he knew she was likely unable to meet." *Id.* ¶ 122.   Plaintiff also takes issue with the PIP's statement that Pitcher raised performance concerns discussed with Campbell on November 11, 2020, and December 11, 2020. *Id.*   Plaintiff asserts that Pitcher's "support" for the PIP consists of "those two conversations and Ms. Campbell allegedly not meeting her sales goals for FY2020,[] when she was out on job-protected FMLA leave for a good portion of the year." *Id.* ¶ 123.

As stated previously, Ms. Campbell reiterates that she "was ranked 36/74 in February 2021," putting her "in the top 50% of the sales force nationwide." *Id.* ¶ 124.   She also claims that she "outperformed several male colleagues . . . ." *Id.*   And, "she was outperforming her team and

Mr. Pitcher as of March 25, 2021, ranking 3/8 in sales in her team." *Id.* According to plaintiff, "no other employee was given a PIP for finishing below 50% of the sales force, including Ms. Campbell's male non-disabled colleagues." *Id.* ¶ 125.

In March 2021, plaintiff "again spoke with Ms. McGlone regarding Mr. Pitcher's harassment and retaliatory behavior." *Id.* ¶ 126. During that "telephone call," plaintiff "ma[de] yet another request for reasonable accommodations." *Id.* ¶ 152. Then, following the issuance of the PIP, plaintiff again "spoke with Ms. McGlone regarding Mr. Pitcher's harassment and retaliatory behavior." *Id.* ¶ 153; *see also id.* ¶ 126. Following this conversation, plaintiff "finally received a request for information regarding her accommodation request." *Id.* ¶ 127; *see also id.* ¶ 153. But, "at that time, Ms. Campbell was consumed with the unreasonable demands placed on her by Mr. Pitcher to save her job and she felt she could not leave work to visit a physician and complete the paperwork without facing retaliation." *Id.* ¶ 127; *see also id.* ¶ 153.

As stated, Becton terminated Campbell on May 4, 2021. *Id.* ¶ 132. It cited plaintiff's failure to meet the expectations set forth in the PIP, which plaintiff claims were "unrealistic." *Id.* Specifically, her "termination letter cited her failure to meet the 2021 Fiscal Year sales quota which was originally $450,000." *Id.* ¶ 133. However, shortly after plaintiff's termination, "BD reduced each sales representative's quota to $350,000, making Ms. Campbell's YTD around 97% at her termination." *Id.*

Plaintiff alleges that the standards to which she was held "far exceeded the roles and responsibilities of her position" and "exceeded what was expected of any of the other members of her team." *Id.* ¶ 134. And, she alleges that, "[a]s a result of Defendant's discrimination, harassment, and retaliation," she "suffered extreme emotional distress including, but not limited

to, increased anxiety, exacerbated symptoms of insomnia, loss of appetite, and depression." *Id.* ¶ 135.

On July 19, 2021, plaintiff filed an "Inquiry of Discrimination" with the Maryland Commission on Civil Rights. *Id.* ¶ 10.[10] And, on August 5, 2021, plaintiff, through counsel, filed a Charge with the EEOC. *Id.* ¶ 11; *see also* ECF 19-2. The Charge, which is six and a half typed pages in length, recounts facts similar to those contained in the Amended Complaint. *See* ECF 19-2 at 5–11. Campbell also checked boxes for discrimination on the basis of "sex," "disability," and "retaliation," as well as "continuing action." *Id.*

Plaintiff explains that "[b]ecause Plaintiff had filed with the EEOC, the Maryland Commission declined to further investigate Plaintiff's Inquiry of Discrimination." ECF 19, ¶ 12. On August 25, 2022, upon the EEOC's conclusion of its investigation, the EEOC issued a "Notice of a Right to Sue" to plaintiff. *Id.* ¶ 13. Plaintiff filed suit in this court on November 23, 2022. ECF 1.

## II. Standard of Review

The Motion is styled as a motion for partial dismissal under Fed. R. Civ. P. 12(b)(6). *See* ECF 20. A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A

---

[10] Plaintiff did not submit a copy of her MFEPA charge with her suit.

Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide a defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304–05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.

2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).  But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v. Navy Fed. Credit Union*, No. 21-2323, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

To resolve a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief.  *Twombly*, 550 U.S. at 570.  With regard to a discrimination claim under Title VII, for example, a plaintiff is not required to plead a prima facie case of discrimination.  *McCleary-Evans v. Md. Dep't of Transportation*, 780 F.3d 582, 584-85 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016); *see Felder v. MGM National Harbor, LLC*, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (per curiam).  "Instead, a plaintiff must allege sufficient facts 'to satisfy the elements of a cause of action created by [the applicable] statute.'"  *Felder*, 2022 WL 2871905, at * 1 (quoting *McCleary-Evans*, 780 F.3d at 585) (alteration in *Felder*).  Therefore, to survive a motion to dismiss, a plaintiff must "plausibly allege" discriminatory conduct because of her protected status, such as race or sex.  *Felder*, 2022 WL 2871905, at *1; *see* 42 U.S.C. § 2000e-2(a)(1).

The same is true under the MFEPA and the ADA.  *See Mason v. Sun Recycling, LLC*, GLS-18-2060, 2020 WL 1151046, at *12 n.6 (D. Md. Mar. 9, 2020) ("To survive a motion to dismiss related to a failure to accommodate [under the ADA], a plaintiff need not plead facts to establish a prima facie case. Rather, a plaintiff must state a plausible claim for relief.") (citing *Chappel v. City of Baltimore*, ELH-18-3328, 2019 WL 1746697, at *3 (D. Md. Apr. 17, 2019)); *see Grant v. Baltimore Police Dep't*, RDB-21-2173, 2022 WL 1321593, at *7 (D. Md. May 3, 2022) ("Pursuant to the decision of the Maryland Court of Appeals in *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735, 742 (Md. 2007), this Court applies 'Title VII case law in adjudicating [M]FEPA claims.'") (quoting *Linton v. Johns Hopkins Univ. Applied Physics Lab.*, LLC, JKB-10-276, 2011 WL 4549177 (D. Md. Sep. 28, 2011)).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of her opposition briefing.  *See, e.g.*, *De Simone v. VSL Pharmaceuticals, Inc.*,

36 F.4th 518, 531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief); *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Moreover, at the Rule 12(b)(6) stage, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

To survive dismissal under Rule 12(b)(6), plaintiff is not required to assert a prima facie case as to her claims. In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the prima facie case "is an evidentiary standard, not a pleading requirement." Further, the Court stated that it has "never indicated that the requirements for establishing a prima facie case . . . apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Therefore, "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022); *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020); *McCleary-Evans*, 780 F.3d at 584.

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. Cnty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of *Twombly* is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied*, 583 U.S. 1044 (2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *See Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x. 745, 747–48 (4th Cir. 2017) ("While a plaintiff need not plead a prima

facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *see also Holloway v. Maryland*, 32 F.4th 293, 298–99 (4th Cir. 2022); *McCleary-Evans*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). In other words, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190).

Nevertheless, reference to the prima facie case informs a court's evaluation of the adequacy of a plaintiff's allegations in the face of a motion to dismiss. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 314 (2015); *see also Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1300–01 (N.D. Cal. 2020) ("When a plaintiff does not plead a prima facie case, courts still look to the elements of the prima facie case 'to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'") (citation omitted). However, the Fourth Circuit has "cautioned that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable' . . . ." *Felder*, 2022 WL 2871905, at *1 (quoting *Woods*, 855 F.3d at 652).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Pendleton v. Jividen*, ___ F.4th ___, 2024 U.S. App. LEXIS 6624, at *5 (recognizing that parties may incorporate documents into a complaint by reference); *Goines*, 822 F.3d at 166 (a court may

properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  The court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."  *Id*.  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id*.

Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the

complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods*, 855 F.3d at 642; *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012).

For a document to be integral, a "plaintiff's claims must turn on, or otherwise be based on, the contents of the document." *Brentzel v. Fairfax Transfer and Storage, Inc.*, 2021 WL 6138286, at *2 (4th. Cir. Dec. 29, 2021) (per curiam) (citing *Goines*, 822 F.3d at 166). Further, to be "integral," a document must be one "that by its 'very existence, and *not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "As examples, 'courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute.'" *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611 n.4 (quoting *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, JFM-10-0206, 2010 WL 2732334, at *2 (D. Md. July 8, 2010)).

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort

to sources whose accuracy cannot reasonably be questioned." This includes taking judicial notice of documents from state court proceedings and other matters of public record, without converting the motion to one for summary judgment. *Parikh v. Frosh*, PX-22-110, 2023 WL 131043, at *5 (D. Md. Jan. 9, 2023); *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir.); *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 246 n.2 (D. Md. 2013); *cf. Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (concluding that a district court may "properly take judicial notice of its own records").

However, there are limitations under Fed. R. Evid. 201. A court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Notably, "[i]n employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, MOC-20-697, 2021 WL 2210895, at *1 n.3 (W.D.N.C. June 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)); *see Jacques v. Balt. City Police Dep't*, SAG-21-02682, 2022 WL 1061980, at *3 (D. Md. Apr. 8, 2022); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 907 n.1 (D. Md. 2017), *aff'd in part*, *vacated in part on other grounds*, 716 F. App'x 164 (4th Cir. 2017). Here, plaintiff appended to her Amended Complaint (ECF 19) a copy of the Charge of Discrimination that she filed with the EEOC on August 5, 2021. ECF 19-2; *see also* ECF 19, ¶ 11.

Additionally, defendant included with its Motion (ECF 20) an email chain between Pitcher and Campbell concerning a client. ECF 20-2. Pitcher's email to Campbell on January 4, 2021, contained in the email chain, is referenced in the Amended Complaint. *See* ECF 19, ¶¶ 111, 112.

Based on the principles outlined above, I may consider ECF 19-2, because "[i]n employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell*, 2021 WL 2210895, at *1 n.3.  However, I decline to consider ECF 20-2. Although ECF 20-2 is referenced in the Amended Complaint (ECF 19, ¶¶ 111, 112), the email chain contained at ECF 20-2 is not integral to the Amended Complaint, nor does it give rise to "the legal rights asserted'" by plaintiff.  *Chesapeake Bay Found., Inc.*, 794 F. Supp. at 611.

### III. Discussion

### A.  Title VII Claims (Count V and Count VII)

Campbell alleges that Becton violated Title VII by discriminating against her on the basis of sex (Count VI).  ECF 19, ¶¶ 231–39.  Campbell also alleges that Campbell subjected her to *quid pro quo* sexual harassment (Count V)[11] as well as a hostile work environment (Count VII).  *Id.* ¶¶ 214–30, 240–52.  Becton has moved to dismiss Counts V and VII.  ECF 20-1 at 3.  Before evaluating the parties' arguments, I shall first review general legal principles with respect to Title VII.

### 1.  Title VII—General Principles

Title VII prohibits "two categories of employment practices."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).  Under the statute, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e–

---

[11] Plaintiff does not use the term "*quid pro quo*" in the text of Count V.  But, the allegations in Count V are tantamount to a *quid pro quo* claim.  ECF 19, ¶¶ 214–30.  And, in her Opposition, plaintiff asserts that Count V constitutes a claim of *quid pro quo* sexual harassment.  *See, e.g.*, ECF 21 at 19, 20, 22.

2(a); *see Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).  The statute also makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants from employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 20003-2(a).

The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).  Moreover, "terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).  The "two proscriptions" set forth above are "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision . . . ."  *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 771; *see Young v. United Parcel Servs., Inc.*, 575 U.S. 206 (2015); *Roberts*, 998 F.3d at 117; *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).

In addition, Title VII prohibits an employer from retaliating against an employee for complaining about conduct made unlawful by Title VII.  Section 2000e-3 of 42 U.S.C. states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

In particular, § 2000e-3 bars discrimination "based on an employee's opposition to conduct made unlawful by Title VII or participation in any Title VII investigation, proceeding, or hearing."

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205–06 (4th Cir. 2019); *see Massaro v. Fairfax Cnty.*, ___ F.4th ___, 2024 WL 1162061, at *5 (4th Cir. Mar. 19, 2024); *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 410–11 (4th Cir. 2022); *Sempowich v. Tactile Systems Tech., Inc.*, 953 F.4th 643, 649–50 (4th Cir. 2021); *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). "This provision is sometimes referred to as the 'anti-retaliation' provision." *Perkins*, 936 F.3d at 206.

At trial, a plaintiff may establish a Title VII claim "through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas*, 715 F. App'x at 302. The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 575 U.S. at 228–29 (construing the Pregnancy Discrimination Act); *Massaro*, 2024 WL 1162061, at *5; *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021).

Notably, the *McDonnell Douglas* proof scheme is merely "a procedural device, designed only to establish an order of proof and production" at trial. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful

discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  But, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intel. Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, it "is 'not intended to be an inflexible rule.'" *Young*, 575 U.S. at 228 (citation omitted).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.

The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *see also Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was

pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in *Adams* and *Jiminez*).   In other words, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle*, 650 F.3d at 336.

The second avenue of proof is considered "a 'pretext' framework, under which the [plaintiff], after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination."  *Hill*, 354 F.3d at 285 (citing *Burdine*, 450 U.S. at 252–53 and *McDonnell Douglas Corp.*, 411 U.S. at 807).  "To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were 'unworthy of credence' and (2) unlawful discrimination was the actual motive for the decision."  *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 573 (D. Md. 2010) (quoting *Reeves*, 530 U.S. at 143); *see Congress v. Gruenberg*, 643 F. Supp. 3d 203, 230 (D.D.C. 2022) ("A plaintiff may make this showing of pretext by relying on '(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.'") (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an

employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations and citation omitted). When the question is whether the decisionmaker acted with discriminatory animus, only the "perception of the decision maker" is "relevant to the question." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citations omitted). Thus, "the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Id.* at 315.

As noted, at this stage, plaintiff is not required to set forth facts that establish a prima facie case under Title VII. *Bing*, 959 F.3d at 616. This is because the "prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510. Instead, a plaintiff need only "offer facts that plausibly support inferences that" the elements of her claim are satisfied. *Laurent-Workman*, 54 F.4th at 210.

Nevertheless, as discussed, reference to the proof methodologies serves to inform a court's evaluation of the sufficiency of the allegations, and whether they state a plausible claim for relief. *Coleman*, 626 F.3d at 190; *see also Bass*, 324 F.3d at 765; *Young*, 108 F. Supp. 3d at 314; *Cloud*, 436 F. Supp. 3d at 1300–01. In particular, "the complaint must 'state a plausible claim for relief' that 'permits the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman*, 626 F.3d at 190 (alterations omitted) (citing *Iqbal*, 556 U.S. at 679). The Fourth Circuit has made clear that "while a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Coleman*, 626

F.3d at 190 (internal citation omitted) (citing *Twombly*, 550 U.S. at 555); *see also Francis*, 588 F.3d at 193.

Generally, to establish a prima facie case of discrimination based on disparate impact, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman*, 626 F.3d at 190); *see Goode v. Cent. Va. Legal Aid Soc.*, *Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman*, 626 F.3d at 190); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

In disparate treatment cases, "which involve 'the most easily understood type of discrimination,' the plaintiff is required to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988) (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). "Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext) . . . '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves*, 530 U.S. at 153).

Unlike in a disparate treatment case, in a disparate impact case, "a plaintiff need not necessarily prove intentional discrimination in order to establish that an employer has violated" Title VII. *Watson*, 487 U.S. at 986. Instead, a plaintiff may prove a claim by demonstrating that "policies or practices that are neutral on their face and in intent . . . nonetheless discriminate in effect against a particular group." *Int'l Brotherhood of Teamsters*, 431 U.S. at 349. "The evidence

in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson*, 487 U.S. at 987.

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee.  Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019); *see Sempowich*, 19 F.4th at 649–50.  Moreover, at trial a plaintiff may introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006).  And, with regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing*, 959 F.3d at 616 n.8); *see Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)).

Generally, in evaluating whether a plaintiff has met the legitimate expectations of her employer, "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'"  *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (quoting *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996), *cert. denied,* 540 U.S. 1073 (2003)).  *See*, *e.g.*, *Hill v. Southeastern Freight Lines, Inc.*, 523 F. App'x 213, 216 (4th Cir. 2013) (per curiam); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 (4th Cir. 2009) (per curiam); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 363 (4th Cir. 2005) (per curiam).  But, in *Sempowich*, 19 F.4th at 650, the Fourth Circuit said: "[A]lthough we have held that we must focus on the employer's perception in the context of the *pretext* stage, we have not so held with respect to a plaintiff's prima facie case."  (Citations omitted) (italics in *Sempowich*).

In the years since Title VII's enactment, the Supreme Court has made clear that discrimination on the basis of sex may be manifested in a variety of ways. An employer discriminates on the basis of sex, for example, when it has different hiring criteria for men and women that are not related to a bona fide occupation qualification. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam) ("The Court of Appeals therefore erred in reading [Title VII] as permitting one hiring policy for women and another for men—each having pre-school-age children."). Sexual harassment, such as "'[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature,'" may also constitute sex-based discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 CFR § 1604.11(a) (1985)). This is so regardless of whether the harasser and the victim are of the opposite or same sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ("[S]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII . . . .").

Courts have recognized a subset of sexual harassment claims knowns as "*quid pro quo*" claims, where "sexual consideration is demanded in exchange for job benefits." *Rachel–Smith v. FTData, Inc.*, 247 F.Supp.2d 734, 745 (D. Md. 2003). To state a claim for *quid pro quo* sexual harassment under Title VII, a plaintiff must show "that (1) he was subject to unwelcome sexual harassment; (2) his reaction to the harassment affected tangible aspects of the terms and conditions of employment; and (3) the employer knew or should have known of the harassment and failed to take remedial action." *Eke v. United Therapeutics*, PX-18-2941, 2023 WL 5297428, at *9 (D. Md. Aug. 16, 2023) (citing *Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 646–47 (D. Md. 2002) and *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 390 (D. Md. 2010)); *see Arsenault v. Dep't of Pub. Safety & Corr. Servs.*, RDB-20-0998, 2020 WL 7694472, at *3 (D. Md. Dec. 28,

2020); *see also Reid v. DeJoy*, JRR-22-01285, 2023 WL 3340073, at *13–14 (D. Md. May 10, 2023), *aff'd*, No. 23-1525, 2023 WL 8826953 (4th Cir. Dec. 21, 2023).

Title VII also provides a right of action for employees who are subjected to a hostile work environment on the basis of their membership in a protected class. "Hostile environment claims are different in kind from discrete acts," because "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). But, "[a] hostile work environment exists only when the workplace is so 'permeated with discriminatory intimidation, ridicule, and insult,' that it 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations removed)); *see also Laurent-Workman*, 54 F.4th at 210 (quoting *Harris*, 510 U.S. at 21).

To state a claim for hostile work environment under Title VII, "'plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex [, race, color, religion, or protected activity], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.'" *Cosby*, 93 F.4th at 716 (quoting *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011)); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *McIver*, 42 F.4th at 407.

As indicated, Title VII also prohibits retaliation by an employer under certain circumstances. The Fourth Circuit has made clear that the *McDonell Douglas* proof scheme applies to a retaliation claim. *See, e.g.*, *Smith v. CSRA, Inc.*, 12 F.4th 396, 416 (4th Cir. 2021). Thus, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the [*McDonnell Douglas*] burden-shifting

framework." *Strothers*, 895 F.3d at 327 (citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

To state a claim for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see also Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016). The elements are discussed, *infra*.

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies.[12] *See Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 384 (4th Cir. 2022); *McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016); *Bryant v. Bell Atlantic, Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); s*ee Bush v. Frederick Cnty. Pub. Schs.*, 2024 WL 639255, at *3 (4th Cir. Feb. 15, 2024) (per curiam); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). This period is extended to 300 days in a deferral state, such as Maryland. *See Bush*, 2024 WL 639225, at *3; *Garnes v. Maryland*, RDB-

---

[12] The same is true under the MFEPA and the ADA. *See Bush v. Frederick Cnty. Pub. Schs.*, 2024 WL 639255, at *3 (4th Cir. Feb. 15, 2024) (per curiam) ("Both Title VII and the [MFEPA] require a plaintiff alleging employment discrimination to exhaust administrative remedies before filing their lawsuit, or else the claim is time barred."); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) (the ADA follows Title VII's "requirement that a plaintiff must exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court").

17-1430, 2018 WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

Moreover, "a complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed." *Fort Bend Cnty. v. Davis*, 587 U.S.___, 139 S. Ct. 1843, 1847 (2019) (citing § 20003-5(f)(1); 29 CFR § 1601.28).  "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer."  *Davis*, 139 S. Ct. at 1847 (citing § 2000e-5(f)(1)).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted).  It "'ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.'"  *Cowgill*, 41 F.4th at 384 (citation omitted).  If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit.  *See*, *e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant*, 288 F.3d at 132.

However, exhaustion is not jurisdictional.  It is, instead, a "claim-processing rule[] that must be timely raised to come into play." *Fort Bend Cnty.*, 139 S. Ct. at 1846, 1850.  Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).  *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Fort Bend Cnty.*).

Although administrative exhaustion is not jurisdictional, the exhaustion process has substantive effect. Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans*, 80 F.3d at 963. Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to construe them "with utmost liberality." *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) (citation omitted); *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594

(quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Cowgill*, 41 F.4th at 384; *Stewart*, 912 F.3d at 705.

## 2.   The Contentions

Campbell asserts that "[a]lmost immediately" upon meeting Pitcher in the fall of 2019, she was subject to *quid pro quo* sexual harassment and a hostile work environment that "continued all the way until Ms. Campbell's termination" on May 4, 2021.   ECF 21 at 30.   Defendant moves to dismiss the claims of *quid pro quo* sexual harassment (Count V) and hostile work environment (Count VII).   ECF 19, ¶¶ 214–30, 240–52; ECF 20-1 at 3.   However, defendant does not wade into the merits of Counts V or VII.   Instead, defendant focuses its argument solely on the timeliness of the claims.

As defendant observes, "[f]or Title VII claims arising in Maryland, the charge of discrimination must be filed within 300 days after the allegedly unlawful employment practice occurred."   ECF 20-1 at 10 (citing *Gilbert v. Freshbikes, LLC*, DKC-14-0609, 32 F. Supp. 3d 594, 605 (D. Md. 2014)).   Becton asserts: "If the statutory period lapses between the allegedly discriminatory incident and the filing of the EEOC charge, the claim is time-barred in federal court."   ECF 20-1 at 10 (citing *Spearman v. City of Annapolis*, ADC-21-1779, 2022 WL 1720154, at *3 (D. Md. May 27, 2022)).

Campbell filed her Charge with the EEOC on August 5, 2021.   ECF 19-2; *see also* ECF 19, ¶ 11.   According to defendant, "[t]he only Title VII claims that can be asserted in this action are therefore limited to those that arose within the 300 days before she filed the charge, *i.e.*, October 10, 2020. Any claims that arose prior to October 10, 2020 fall outside the statutory period and are forever time-barred."   ECF 20-1 at 10.

41

On this basis, Becton argues that Counts V and VII "should be dismissed because there are no facts showing that such claims arose at any time within the 300-day statutory period before the date Plaintiff filed a charge of discrimination with the" EEOC.  *Id.* at 3.  Defendant adds: "Plaintiff does not allege that Mr. Pitcher made any sexual advances toward her, or that she was alone with him at any time *on or after October 10, 2020*."  *Id.* at 11 (emphasis in original).  Thus, defendant contends, *id.*: "As the Amended Complaint does not plead facts showing that any sexual harassment occurred within 300 days of the date she filed her EEOC charge, Plaintiff's sexual harassment and hostile work environment claims under Title VII are time-barred and must be dismissed under Rule 12(b)(6)."

Plaintiff counters that defendant has misapplied the law.  ECF 21 at 28.  She asserts, *id.*: "Defendant fails to recognize the fact that claims of sexual harassment are treated differently than disparate impact or disparate treatment claims; this is true for both categories of sexual harassment, because they are not composed of discrete discriminatory acts."  She argues, *id.* at 28–29:

> "A hostile work environment claim is composed of a series of separate acts that *collectively* constitute one 'unlawful employment practice.'" *Id.* (quoting 42 U.S.C. § 2000e-5(e)(1)) (emphasis added). Therefore, the unlawful act in a sexual harassment case, both quid pro quo and hostile work environment, *occurs over time*, not on a particular day, in contrast to discrete acts of discrimination alleged in disparate treatment or disparate impact cases. Applying the "continuing violation" doctrine to Title VII claims, the U.S. Supreme Court has held that hostile work environment claims are timely if at least one act contributing to the claim occurred within the 180- or 300-day filing period, whichever applies.[] *Morgan*, 536 U.S. at 118. The Court has further explained that: (a) the fact that some acts contributing to the hostile work environment claim occurred before the 180- or 300-day filing period does not make the claim untimely and (b) if an employer engaged in conduct sufficient to make an actionable hostile work environment claim, the unlawful employment practice has occurred, and an individual may file an EEOC charge even if the harassment is ongoing. *Id.* at 117–18.

Further, plaintiff asserts: "If the charging party alleges the continuing violation theory in the original EEOC charge, then she will benefit from the extended limitations period."  *Id.* at 29

(citing *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985)).  And, in her Charge, filed with the EEOC, plaintiff alleged a continuing violation. *Id.* at 29 (citing ECF 19, ¶¶ 11, 229, 246); *see also* ECF 19-2 at 4.  Thus, plaintiff argues: "Since Ms. Campbell's EEOC Charge was filed on August 5, 2021, and checked the box alleging the continuing action/violation theory, Defendant is incorrect in claiming that any claims that arose prior to October 10, 2020, are time-barred."  ECF 21 at 29.

Plaintiff also posits that "'all acts which constitute the Title VII claim are part of the same unlawful employment practice.'"  *Id.*.  Therefore, under the continuing violation theory, she contends that she "'can recover for acts occurring even beyond that time period, as long as at least a portion of the hostile work environment occurred within the relevant limitations period.'"  *Id.* (citations omitted).

In its Reply, defendant maintains that "the 'one employment practice' doctrine does not apply to *quid pro quo* harassment . . . ."  ECF 22 at 2; *see also id.* at 9.  Defendant reiterates that plaintiff "does not identify any offensive statement or sexual advance made by Mr. Pitcher on or after October 10, 2020 . . . ."  *Id.* at 8.  And, defendant argues that the Amended Complaint fails to allege that Pitcher "made any demand or request to her for sexual favors in exchange for employment benefits . . . ."  *Id.* at 2; *see also id.* at 9–10.

### 3.  Discussion

Becton does not dispute that Count VII sufficiently alleges that plaintiff was the recipient of unwelcome conduct on the basis of her sex, sufficiently severe or pervasive to alter her conditions of employment, imputable to the employer.  *See Boyer-Liberto*, 786 F.3d at 277.

In plaintiff's EEOC Charge, she checked the box alleging a "continuing action," thereby implicating the continuing violation theory.  *See* ECF 19-2 at 4.  And, the Amended Complaint

sets forth sufficient facts to constitute a continuous hostile work environment that extended to within 300 days of the filing of the Charge on August 5, 2021. *See, e.g.*, ECF 19, ¶¶ 27–35, 37–41, 47–52, 57–62, 65–71, 73–76, 88–99, 104, 106, 110–23, 125–26, 135, 153, 163. Therefore, I am satisfied that Count VII pleads a timely hostile work environment claim. Accordingly, I shall deny the Motion as to Count VII.

On the other hand, Count V does not plead a timely *quid pro quo* sexual harassment claim. In particular, plaintiff has failed to allege an act of sexual harassment that occurred within 300 days prior to the filing of the EEOC Charge on August 5, 2021.

Plaintiff has already amended her suit. And, the Amended Complaint is quite detailed, and sometimes repetitive. It seems unlikely that plaintiff inadvertently omitted facts concerning discrete acts of sexual harassment that occurred within 300 days of the filing of the Charge. Therefore, I shall dismiss Count V, with prejudice.

### B.   Failure to Accommodate under the ADA (Count I) and the MFEPA (Count XI)

Campbell alleges that Becton violated the ADA by failing to provide her with reasonable accommodations (Count I). ECF 19, ¶¶ 136–55. Campbell also alleges that Becton violated the MFEPA by failing to provide her with reasonable accommodations and treating her differently because of her disabilities (Count XI). ECF 19, ¶¶ 311–21. Becton has moved to dismiss both Count I and Count XI. ECF 20-1 at 2–3.

MFEPA "is the State law analogue to Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011). *See generally* S.G. §§ 20-601 *et seq*. It "contains functionally identical prohibitions and is evaluated under the same framework as the Americans with Disabilities Act, 42 U.S.C. § 12112(a)." *Destiny Charity Rose Teel v. Md. Natural Treatment Solutions, LLC*, RDB-23-1694, 2024 WL 1075421, at *4 (D. Md. Mar. 12, 2024) (citing

*Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) and *Peninsula Reg'l*

*Med. Ctr. v. Adkins*, 448 Md. 197, 218–19, 137 A.3d 211, 223–24 (2016)).

In the Motion and the Opposition, the parties discuss Count I and Count XI collectively.  I

shall do the same.

### 1.   The ADA Generally

The ADA, 42 U.S.C. §§ 12101 *et seq.*, was enacted "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities," 42

U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing

discrimination against individuals with disabilities."  *Id.* § 12101(b)(2).  To that end, the statute

"prohibits discrimination against persons with disabilities in three major areas of public life:

employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C.

§§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189." *A*

*Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v.*

*Lane*, 541 U.S. 509, 516-17 (2004)).[13]

Title I of the ADA, which concerns employment, prohibits discrimination "against a

qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees . . . . and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).  Additionally, "discrimination against a qualified individual

on the basis of disability" includes "denying employment opportunities to a job applicant or

employee who is an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(B).

---

[13] The ADA contains five titles. Title IV pertains to Telecommunications and Title V
contains Miscellaneous Provisions.

The ADA also bars the discharge of a qualified employee because she is disabled.  *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014).

A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)).

Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . . working" and "reproductive functions." 42 U.S.C. § 12102(2)(A), (B).[14]  An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," is considered to have a disability.  42 U.S.C. § 12102(1)(B), (C).  A plaintiff has a "record of disability" if she can show that she "'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Foore v. Richmond*, 6 Fed. App'x 148, 153 (4th Cir. 2001) (quoting 29 C.F.R. § 1630.2(k)(1)).  "The question of whether a plaintiff is disabled under the ADA is 'a question of law for the court.'" *Coghill v. Bd. of Educ. of Prince George's Cnty.*, GJH-14-2767, 2017 WL 1049470, at *5 (D. Md. Mar. 17, 2017) (citation omitted), *aff'd*, 703 F. App'x 211 (4th Cir. 2017). And, to resolve this question, the court must make "an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).

A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that

---

[14] In the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, Congress considerably broadened the definition of disability, as well as the standard for "substantially limits." *See Miller v. Md. Dep't of Natural Resources*, 813 F. App'x 869, 875 (4th Cir. 2020) (Mem.); *Summers*, 740 F.3d at 329.

such individual holds or desires." 42 U.S.C. § 12111(8). The "date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a disability.'" *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000).

"[D]iscrimination against a qualified individual on the basis of disability" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(B). In addition, "[d]iscrimination can include failing to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 311 (4th Cir. 2011). An exception is if the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. 12112(b)(5)(A).

"A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . . to perform the essential functions of [a] position,' 29 C.F.R. § 1630.2(o)(1)(ii); or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . . other similarly situated employees without disabilities,' *id.* § 1630.2(o)(1)(iii)." *Hamel v. Bd. of Educ. of Harford Cnty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018) (alterations in *Hamel*).

A reasonable accommodation "may include . . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals

with disabilities." 42 U.S.C. § 12111(9); *see also Tartaro-McGowan*, 91 F.4th at 166. A reasonable accommodation may also include accrued paid leave or unpaid leave. *See* 29 C.F.R. pt. 1630 app. § 1630.2(o) ("[O]ther accommodations could include . . . permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment[.]").

However, "[t]he ADA does not provide an all-inclusive definition of the term 'reasonable accommodation.'" *Tartaro-McGowan*, 91 F.4th at 166. And, "'the range of reasonable accommodations is broad.'" *Id.* (quoting *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020)). But, an accommodation is not reasonable as a matter of law "if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of [the] program." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 n.17 (1987) (internal citations omitted) (alteration in *Sch. Bd. of Nassau Cnty.*); s*ee Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012).

"It is not difficult to request an accommodation." *Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 166 (4th Cir. 2024). And, "[t]o trigger an employer's duty to accommodate, a disabled employee need only 'communicate[] [his] disability and desire for an accommodation.'" *Id.* (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015)) (alterations in *Kelly*). Further, "an employee need not . . . 'identify a specific, reasonable accommodation.'" *Kelly*, 90 F.4th at 166 (quoting *Jacobs*, 780 F.3d at 581). But, "when a valid request leaves 'the precise nature of the disability or desired accommodation' ambiguous, the employer should seek clarification." *Kelly*, 90 F.4th at 166 (quoting *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 487 n.14 (5th Cir. 2023)). Moreover, under the ADA, there is an expectation "that the employer will pursue an 'informal, interactive process' with its disabled employees to ascertain

48

the extent of their disabilities and the range of accommodations that might address them." *Kelly*, 90 F.4th at 166 (quoting *Wilson*, 717 F.3d at 346).

Of import, "[t]he ADA requires reasonableness, not perfection." *Tartaro-McGowan*, 91 F.4th at 171. "And as long as the employer's chosen accommodation is reasonable, even if not perfect, [the court's] inquiry is at an end—'not even a well-intentioned court may substitute its own judgment for the employer's choice.'" *Id.* at 167 (quoting *Elledge*, 979 F.3d at 1012).

"Modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the ADA incorporates that statute's enforcement procedures, *id.* § 12117(a), including the requirement that a plaintiff must exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court, *see id.* § 2000e–5(b), (f)(1)." *Sydnor*, 681 F.3d at 593; *see Bush*, 2024 WL 639255, at *3; *see also Mehan v. United Parcel Serv.*, RDB-18-1788, 2019 WL 1370096, at *6 (D. Md. Mar. 26, 2019) ("The ADA expressly adopts the administrative exhaustion provisions of Title VII . . . which requires the plaintiff to file a charge of discrimination with the EEOC within 180 days after the occurrence of an alleged unlawful employment practice.") (citing 42 U.S.C. § 12117(a) and *Krouse v. Johns Hopkins HealthCan, LLC*, RDB-18-1838, 2019 WL 979298, at *1 n.2 (D. Md. Feb. 28, 2019)). Therefore, under the ADA a plaintiff must file a charge of discrimination with the EEOC "within 300 days of the actions giving rise to his ADA claims." *Mehan*, 2019 WL 1370096, at *6; *see also Henson v. Baltimore City Bd. of Sch. Commissioners*, ADC-23-0004, 2023 WL 2992727, at *3 (D. Md. Apr. 18, 2023) (citing 42 U.S.C. § 2000e-5(e)(1), (f)(1); 42 U.S.C. § 12117(a)).

The administrative claims process is "an integral part" of the ADA's enforcement scheme. *See Sydnor*, 681 F.3d at 593. "Allowing [the EEOC] first crack at these cases respects Congress's intent 'to use administrative conciliation as the primary means of handling claims, thereby

encouraging quicker, less formal, and less expensive resolution of disputes.'" *Id.* (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

As with Title VII, in the context of the ADA, "[d]isability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs*, 780 F.3d at 572 (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50, 49 n.3 (2003)); *see Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases"); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391–92 (4th Cir. 2001) (applying the Title VII framework). Thus, the same avenues of proof available for Title VII apply to a disability discrimination claim. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–70 (4th Cir. 1999) (holding that Title VII's mixed-motive causation requirement, and not the Rehabilitation Act's "solely because of" causation requirement, applies to the ADA).

To state a prima facie claim of discrimination under the ADA, the plaintiff is generally required to allege that (1) the employee is a qualified individual with a disability; (2) the employee was discharged or subjected to other adverse employment action; (3) at the time of the adverse employment action, the employee was "'performing the job at a level that met [the] employer's legitimate expectations'"; and (4) the adverse employment action or "'discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.'" *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (quoting *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)); *see also Jacobs*, 780 F.3d at 572 (quoting *Stowe–Pharr Mills, Inc.*, 216 F.3d at 377); *Summers*, 740 F.3d at 328; *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th

Cir. 1997); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995). "[T]he plaintiff may establish the fourth element of the prima facie case 'either by showing that [comparably qualified] persons outside the protected class were retained in the same position or by producing some other evidence indicating that the employer did not treat [disability] neutrally.'" *Innocent v. Cnty. of Georgetown*, RMG-10-2598, 2012 WL 1655294, at *4 (D.S.C. Apr. 13, 2012), *report and recommendation adopted*, 2012 WL 1655283 (D.S.C. May 10, 2012).

With respect to a prima facie claim of failure to accommodate, a plaintiff must allege: "'(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Jacobs*, 780 F.3d at 579 (quoting *Wilson*, 717 F.3d at 345) (alterations in *Jacobs*); *see Tartaro-McGowan*, 91 F.4th at 164 (citing 29 C.F.R. § 1630.2(n)); *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 219 (4th Cir. 2016) (per curiam); *Wilson*, 717 F.3d at 345; *Rhoads*, 257 F.3d at 387 n.11.

The ADA "does not provide a statute of limitations." *Semenova*, 845 F.3d at 566. "Because Title II of the ADA does not contain a statute of limitations, federal courts 'borrow the state statute of limitations that applies to the most analogous state-law claim.'" *Id.* at 567 (quoting *A Soc'y Without A Name*, 655 F.3d at 347). And, in Maryland, "ADA claims are subject to Maryland's three-year statute of limitations governing general civil actions." *Semenova*, 845 F.3d at 568; *see also Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 266 (4th Cir. 2013) ("Maryland courts apply the three-year limitations period governing civil actions to ADA" claims.)

## 2.  MFEPA

As noted, "[t]he MFEPA contains functionally identical prohibitions and is evaluated under the same framework as the Americans with Disabilities Act, 42 U.S.C. § 12112(a)." *Destiny Charity Rose Teel*, 2024 WL 1075421, at *4 (citing *Miller*, 813 F. App'x at 874, and *Adkins*, 448 Md. 197, 218–19, 137 A.3d 211, 223–24).  S.G. § 20-606(a)(1) specifies, in pertinent part, that "an employer may not . . . (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's . . . disability . . . ."  In addition, S.G. § 20-606(a)(4) bars an employer from "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee."

A claim under MFEPA may proceed under the *McDonnell Douglas* burden-shifting framework.  *Hutty v. PNC Bank, N.A.*, JKB-21-2535, 2024 WL 1014080, at *3 (D. Md. Mar. 8, 2024) ("When analyzing discrimination claims [under Title VII and the MFEPA], courts employ the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) . . . .").  Under MFEPA, a prima facie claim of disability discrimination requires an employee to show: "(1) that he or she had a disability; (2) that notwithstanding the disability, he or she was otherwise qualified for the employment, with or without reasonable accommodation; and (3) that he or she was excluded from employment on the basis of his or her disability."  *Adkins*, 448 Md. at 239, 137 A.3d at 236.

A plaintiff must satisfy the MFEPA's exhaustion requirements, outlined in S.G. § 20-1013(a).  S.G. § 20-1004(c)(1)(i) provides that "a complaint shall be filed" with the Maryland Commission on Civil Rights "within 6 months after the date on which the alleged discriminatory act occurred."  In *Adkins v. Peninsula Reg'l Med. Ctr.*, 224 Md. App. 115, 133 n.9, 119 A.3d 146,

157 n.9 (2015), *aff'd*, 448 Md. 197, 137 A.3d 211 (2016), the Maryland intermediate appellate court said:

> An employee must exhaust the administrative remedies found in SG § 20–1013(a), which provides that the employee may bring a civil action in his or her own right so long as: (1) he or she "initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice"; (2) "at least 180 days have elapsed since the filing of the administrative charge or complaint"; and (3) "the civil action is filed within 2 years after the alleged unlawful employment practice occurred."

The MFEPA has a two-year statute of limitations. *See Adkins*, 224 Md. App. at 133 n.9, 119 A.3d at 157 n.9. "Where a plaintiff fails to file MFEPA claims within two years of the alleged discrimination or retaliation, the claims are time barred and must be dismissed." *Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *3 (D. Md. Jan. 8, 2019) (citing *McCray*, 662 F. App'x at 225); *see also Mattison v. Md. Transit Admin.*, RDB-15-1627, 2016 WL 2898020, at *8 (D. Md. May 18, 2016) ("All claims pursuant to the MFEPA, however, must fall within its two-year statute of limitations.") (citing S.G. § 20-1013(a)(3)).

### 3.   The Contentions

Becton seeks to dismiss Campbell's claims that defendant violated the ADA (Count I) and the MFEPA (Count XI) by failing to provide her with reasonable accommodations. Defendant urges dismissal on the ground that plaintiff "fails to identify a request for reasonable accommodation that Plaintiff made within the applicable limitations period under the ADA (Count I) and the MFEPA (Count XI)." ECF 20-1 at 7. Becton asserts, *id.* at 8: "Plaintiff's claims that Defendant failed to provide her with a later start time as a reasonable accommodation are time-barred under the ADA and MFEPA."

According to Becton, "[u]nder the ADA, Plaintiff's reasonable accommodation claims are actionable only to the extent they arose on or after October 10, 2020 (within 300 days before

Plaintiff filed her EEOC charge on August 5, 2021)." *Id.* (citing *Davis v. Baltimore Hebrew Congregation*, RDB-12-1009, 985 F. Supp. 2d 701, 713 (D. Md. 2013)). And, defendant contends that, "[u]nder the MFEPA, Plaintiff's reasonable accommodation claims are actionable only to the extent they arose on or after January 19, 2021 (within six months of the date Plaintiff filed her MFEPA charge with the Maryland Commission on Civil Rights on July 19, 2021)." ECF 20-1 at 8 (citing *Adkins*, 224 Md. App. at 133 n.9, 119 A.3d at 157 n.9); *see Adkins*, 448 Md. 197, 137 A.2d 211 (2016). Thus, Becton asserts that these claims are "time-barred," as "Plaintiff's reasonable accommodation claims for a later start time therefore arose in May 2020 when Mr. Pitcher allegedly denied that request." ECF 20-1 at 8.

Additionally, Becton contends, *id.*: "Aside from the later start time request, the Amended Complaint does not identify any other request for reasonable accommodation that Plaintiff made to Defendant," apart from some "ambiguous[] claims." Becton maintains that plaintiff "does not plead any facts identifying a reasonable accommodation she was seeking," *id.*, and that "when she was provided with ADA paperwork to make an accommodation request, she did not complete it." *Id.* at 9. In defendant's view, "there is nothing in the Amended Complaint to identify any reasonable accommodation that the Defendant failed to provide during the applicable limitations period." *Id.* And, Becton argues that the lack of a defined reasonable accommodation "denies the Court access to facts it needs to determine that the Plaintiff was a 'qualified individual with a disability.'" *Id.* Therefore, Becton argues, *id.*: "Plaintiff has not stated a plausible failure-to-accommodate claim under the ADA or MFEPA."

In her Opposition, Campbell argues that "[f]ederal regulatory disability law requires that an employer 'initiate an informal, *interactive process* with the individual with a disability in need of the accommodation' *to identify* a reasonable accommodation." ECF 21 at 17 (quoting 29 C.F.R.

§ 1630.2(o)(3)) (emphasis in ECF 21).  In addition, Campbell claims that "Maryland regulations require an employer to make 'an *individualized assessment* of a qualified individual with a disability's ability to perform the essential functions of *a* job . . . ."  ECF 21 at 17 (quoting COMAR 14.03.02.04(B)(3)) (emphasis in ECF 21).

Moreover, plaintiff argues that, "[t]o survive a motion to dismiss, a complaint must simply provide enough information to infer that the plaintiff notified her employer about her need for an accommodation and that the employer refused the requested accommodation or did not engage in the interactive process."  ECF 21 at 21 (citing *Green v. TJX Cos*., DKC-21-0517, 2022 WL 279795, at *4–5 (D. Md. Jan. 31, 2022)).  She adds that, "[a]t the motion to dismiss stage, it is enough for the plaintiff to identify her job and that she needs an accommodation to perform an essential function of the job."  ECF 21 at 20.  According to plaintiff, the Amended Complaint "clearly identified [Campbell's] job and that she needed accommodations to perform an essential function of the job; therefore she has satisfied the requirements of the third element for a failure to accommodate claim at the motion to dismiss stage."  *Id.*

In particular, plaintiff contends: "Ms. Campbell pled she has multiple disabilities[] within the meaning of the ADA and the MFEPA and Defendant does not dispute that she has a disability as defined by the ADA and the MFEPA."  *Id.* at 18.  She also maintains that BD "had notice of Ms. Campbell's disabilities."  *Id.* at 19.  According to plaintiff, "Defendant was first put on notice of Ms. Campbell's disabilities immediately upon the acquisition in fall 2019," and plaintiff "further notified Defendant each time that she sought reasonable accommodations, including in fall 2019, April 2020, May 2020, June 2020, July 2020, October 2020, December 2020, March 2021, and post-PIP."  *Id.*  In addition, plaintiff claims that "Ms. Campbell's physician also put defendant on notice on October 18, 2020, when he submitted BD's Accommodation Substantiation Form stating

that Ms. Campbell would be released to return to work soon, but with certain accommodations for her ADHD." *Id.*

Further, Campbell maintains that, with reasonable accommodations, she "could perform the essential functions of the position . . . ." *Id.* She points to "her track record of over eleven years of employment with no negative performance evaluations and numerous awards and recognition for her work." *Id.* at 20.

Campbell also asserts: "'The ADA imposes upon employers a good-faith duty to engage [with their employees] in an interactive process to identify a reasonable accommodation.'" *Id.* at 21 (quoting *Jacobs*, 780 F.3d at 581) (quotation marks removed) (alteration in *Jacobs*). She argues that she "attempted to request accommodations for her disabilities in 2020 and onward, and Defendant refused to engage in the interactive process, causing Ms. Campbell's performance to begin to suffer." *Id.* Indeed, she claims that "on numerous occasions," defendant "refused to make such an accommodation *or* engage in an interactive process *to identify* a reasonable accommodation for Ms. Campbell in violation of both the ADA . . . and the MFEPA . . . ." *Id.* at 20–21 (emphasis in original).

According to plaintiff, the duty to identify a specific reasonable accommodation "generally is triggered when an employee communicates her disability and need for an accommodation—'even if the employee fails to identify a specific, reasonable accommodation.'" ECF 21 at 21 (quoting *Jacobs*, 780 F.3d at 581). However, plaintiff contends that "identifying a specific reasonable accommodation is not an element of a claim for failure to provide an accommodation under either the ADA or Maryland law . . . ." *Id.*

Plaintiff asserts, *id.* at 22:

[A]s the fourth element of a prima facie case for failure to accommodate requires, the interactive process is to "*identify* a reasonable accommodation." *Peninsula*

56

*Reg'l Med. Ctr.*, 448 Md. at 212, 220 (emphasis added) ("The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace … *Without the interactive process, many employees will be unable to identify effective reasonable accommodations*" (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *overruled on other grounds*, 535 U.S. 391 (2002) (emphasis added))); *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) ("[I]f it is not immediately obvious what accommodation would be appropriate, the ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation.").

In addition, Campbell explains that "while the Maryland regulations do not address procedures for requesting an accommodation, Maryland courts have held that the burden of making a request is a light one, which need not even be in writing . . . ." *Id.* at 23. And, the inquiry as to whether an employee could have reasonably been accommodated "is an inquiry for trial and not relevant at the motion to dismiss stage as long as the employee has sufficiently alleged that she requested a reasonable accommodation and that defendant did not provide one . . . ." *Id.*

Moreover, Campbell contends that she identified "multiple specific reasonable accommodations," which included "later start times" and "accommodations related to her executive functioning deficits due to her ADHD." *Id.* (emphasis removed). Further, "she provided documentation from her physician [who] checked the appliable major life activity boxes, listed suggested accommodations, and provided his phone number and email for questions or clarifications (as is common practice)." *Id.* at 23–24. Although "Sedgewick claimed that additional information was needed to clarify Ms. Campbell's request and that someone from Sedgewick would be back in touch," no one contacted plaintiff. *Id.* at 24.

In Campbell's view, defendant misapplies the law as it relates to the question of whether the claims are time-barred. She explains that the cases defendant cites supporting the contention that Campbell's claims are time-barred "are not about the ADA when discussing the concept of time-barred claims or the 300-day rule and are on a different legal standard than at issue here."

57

*Id.*; *see also id.* at 24–25.  She states: "'Maryland courts apply the three-year limitations period governing general civil actions to ADA' claims." *Id.* at 25 (quoting *Jeandron*, 510 F. App'x at 266).

Campbell insists that her accommodation requests from October 10, 2020, and "onward" are not time-barred under the ADA.  ECF 21 at 26.  These include her requests on October 18, 2020, December 10, 2020, and December 20, 2020.  *Id.*  And, she contends that "her accommodation requests from January 19, 2021, and onward" are not time-barred under the MFEPA. *Id.*  This includes her requests of March 2021.  *Id.*

In any event, Campbell contends that she can use "her accommodation requests from fall 2019 and spring 2020 regarding a later start time for meetings due to her insomnia" as "background evidence in support of her other accommodation requests that are within the limitations period." *Id.* at 25–26.  She asserts, *id.* at 26: "The accommodation requests regarding later meeting start times demonstrate that Ms. Campbell had been asking for accommodations from the start and faced resistance and a total lack of support since the start."[15]

In Reply, defendant asserts: "Plaintiff's argument that the identification of a reasonable accommodation should be left to the ADA's 'interactive process' misses the point that, during the relevant limitations period, she never even proposed a reasonable accommodation to the Defendant."  ECF 22 at 3.  And, defendant argues that the Amended Complaint fails to "articulate any reasonable accommodation that she needed to perform her job or that Defendant should have provided to her."  *Id.*

Defendant also reiterates, *id.* at 4: "Plaintiff's reasonable accommodation claims under the ADA are limited to claims that arose within the 300 days preceding the date she filed her charge

---

[15] This is an evidentiary issue that the Court will not decide at this juncture.

of discrimination with the EEOC."  And, BD maintains that the MFEPA claims "are subject to a two-year limitations period."  *Id.*  Thus, defendant asserts that plaintiff's claims "are therefore limited to the accommodation requests that Plaintiff claims to have made in October 2020, December 2020, and March 2021."  *Id.* at 5.  But, in defendant's view, these requests are insufficient, as they failed to identify a reasonable accommodation.  *Id.* at 5–6.  Defendant notes that when Sedgewick contacted Campbell, "she did not provide the information requested by Defendant."  *Id.* at 6 (emphasis removed).

### 4.  Discussion

Plaintiff filed her Charge with the EEOC on August 5, 2021.  ECF 19-2; *see also* ECF 19, ¶ 11.  The EEOC issued a "Right to Sue" letter on August 25, 2022.  ECF 19, ¶ 13.  And, suit was filed on November 23, 2022.  ECF 1.

As noted, in order to pursue an ADA claim, a plaintiff must first file a complaint with the EEOC within 300 days of the allegedly unlawful conduct.  *See Mehan*, 2019 WL 1370096, at *6.  Accordingly, any ADA claims of plaintiff that occurred prior to October 10, 2020, are untimely.

Plaintiff filed her MFEPA charge with the Maryland Commission on Civil Rights on July 19, 2021.  ECF 19, ¶ 10.  Under MFEPA a claimant must first lodge a complaint with the Maryland Commission on Civil Rights, and it must be filed within six months of the alleged unlawful occurrence.  *See* S.G. § 20-1004(c)(1)(i).  Accordingly, any MFEPA claims that occurred prior to January 19, 2021, are untimely.

Campbell alleges that she made repeated requests for accommodation to her employer, including on October 18, 2020, December 10, 2020, December 20, 2020, and multiple times in March 2021.  ECF 21 at 26.  The requests of October 18, 2020, December 10, 2020, and December 20, 2020 are time-barred under the MFEPA.  *See* ECF 19, ¶ 80, 100–03, 108.  But, they are not

time-barred under the ADA, as they occurred after October 10, 2020.  And, the requests of March 2021 are not time-barred under either statute.  *See id.* ¶¶ 126, 152, 153.

Moreover, I am satisfied that plaintiff has sufficiently alleged claims under the ADA and the MFEPA for failure to accommodate.  First, plaintiff has sufficiently alleged that she is a person with disabilities within the meaning of both statutes.  *See, e.g.*, ECF 19, ¶ 42 ("Ms. Campbell suffers from complex post-traumatic stress disorder ('PTSD') stemming from abuse she endured as a minor, attention-deficit/hyperactivity disorder ('ADHD'), insomnia, generalized anxiety disorder ('GAD'), and major depression.").  Second, defendant does not dispute that Becton had notice of plaintiff's disabilities.  Indeed, plaintiff alleges that she repeatedly informed Becton of her disabilities, at least as early as the fall of 2019, and continuing until her termination on May 4, 2021.  *See* ECF 19, ¶ 140; *see also id.* ¶¶ 80, 100–03, 108, 126, 152–53.

The issues in dispute are whether, with reasonable accommodation, Campbell could have performed the essential functions of the position; whether Becton refused to make reasonable accommodations; and whether Campbell clearly identified a reasonable accommodation.

Campbell alleges that, upon her return from FMLA leave on October 18, 2020, she "submitted multiple forms and substantiating documents from her physician to BD's third-party benefits provider, Sedgewick, in support of her accommodation request."  *Id.* ¶ 80; *see also* ECF 21 at 12.  She also alleges that she made a second request to Sedgewick on October 26, 2020.  ECF 19, ¶ 145.  Sedgewick subsequently asked her for "additional information" and stated "that someone from Sedgewick would be back in touch with her."  *Id.* ¶ 81.  Although Campbell "attempted to contact Sedgewick again on multiple occasions to straighten out the discrepancy," Sedgewick did not respond.  *Id.* ¶ 82; *see also id.* ¶ 84.  It was not until Campbell made a separate request in March 2021, after the PIP was issued, that plaintiff "finally received a request for

information regarding her accommodation request."  *Id.* ¶ 127; *see also id.* ¶¶ 152, 153.  But, plaintiff alleges that "at that time, [she] was consumed with the unreasonable demands placed on her by Mr. Pitcher to save her job and she felt she could not leave work to visit a physician and complete the paperwork without facing retaliation." *Id.* ¶ 127; *see also id.* ¶ 153.

Becton maintains that plaintiff never specified, proposed, or identified a reasonable accommodation.  ECF 22 at 3.  But, plaintiff claims that defendant failed to engage in the interactive process, which would have clarified her request.  A defendant cannot avoid liability for failing to provide a reasonable accommodation by failing to engage in an interactive process with an employee to find a reasonable accommodation.  *See, e.g.*, *Crabil*, 423 F. App'x at 323 ("[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability . . . ."); *Peninsula Reg'l Med. Ctr.*, 448 Md. at 220, 137 A.3d at 224 ("The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace . . . . Without the interactive process, many employees will be unable to identify effective reasonable accommodations.") (citation removed).  Allowing such a result would deter employers from engaging in the interactive process.

Accordingly, I shall deny the Motion as to Counts I and XI.

## C.  Retaliation under the ADA (Count IV), Title VII (Count VIII), and the MFEPA (Count XIV)[16]

The Amended Complaint asserts three counts of retaliation under three statutes. Specifically, Campbell alleges that Becton retaliated against her for requesting accommodations, in violation of the ADA (Count IV).  ECF 19, ¶¶ 195–213.  Campbell alleges that Becton retaliated

---

[16] The parties collectively address retaliation under Title VII, the ADA, and the MFEPA. I shall do the same.

against her for the exercise of rights protected by Title VII (Count VIII). *Id.* ¶¶ 253–67. And, Campbell alleges that Becton violated the MFEPA by retaliating against her for reporting harassment (Count XIV). *Id.* ¶¶ 253–67. Becton seeks to dismiss all three Counts. ECF 20-1 at 3.

### 1. Legal Principles

The ADA's retaliation provision is found at 42 U.S.C. § 12203(a). Title VII's retaliation provision is found at 42 U.S.C. § 2000e-3(a). And, the MFEPA retaliation statute is found at S.G. § 20-606. The parties agree that ADA and MFEPA retaliation claims are analyzed under the same standard as Title VII retaliation claims. ECF 20-1 at 12; ECF 21 at 31; *see, e.g.*, *Bush*, 2024 WL 639225, at *4 (MFEPA standard); *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 n.5 (4th Cir. 2020) (ADA standard); *Rhoads*, 257 F.3d at 391 (ADA standard); *Buckmaster v. Nat'l R.R. Passenger Corp.*, RDB-19-3203, 2022 WL 1081947, at *6 (D. Md. Apr. 11, 2022) (ADA and MFEPA standards); *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 497 (D. Md. 2013) (MFEPA standard).

As noted, 42 U.S.C. § 2000e-3(a) states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this title [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."

"Title VII bars retaliation against an employee [who] has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Cosby*, 93 F.4th at 718 (quoting 42 U.S.C. § 2000e-3(a)); *see Perkins*, 936 F.3d at 213 (Title VII prohibits an employer from retaliating against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices"); *see*

42 U.S.C. § 2000e-3; *see also McIver*, 42 F.4th at 410–11.  The provision's "'purpose is to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up.'" *Laurent-Workman*, 54 F.4th at 212 (quoting *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002)).

To state a claim for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see also Cosby*, 93 F.4th at 718; *Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous*, 828 F.3d at 217.

With respect to the first element, the Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter*, 908 F.3d at 937.  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (per curiam) (citation omitted).  And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122.  As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of

formal charges of discrimination.  The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.")

However, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937–38; *see also Cosby*, 93 F.4th at 718–19.

The second element is that of an "adverse action."  In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added).  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667.  In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, CCB-08-183, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington*

*Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

Moreover, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 431 (4th Cir. 2015.  So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68); *see also Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 156 (4th Cir. 2023).  Notably, "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions.  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

The element of causation is at issue here.  To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see Irani v. Palmetto Health,* 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam).  This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive standard in Title VII's antidiscrimination provision.  *See Foster*, 787 F.3d at 249–50.  In other words, the plaintiff must allege that she suffered an adverse action because she engaged in protected activity.  *Massaro*, 2024 WL 1162061, at *5.  At trial, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.

Of import, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335.  Indeed, "very little evidence of a causal connection is

required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at 127 (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)); *see CSRA*, 12 F.4th at 417.

A plaintiff may attempt to establish that a protected activity caused an adverse action "'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021)); *see CSRA*, 12 F.4th at 417. "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783–84, and citing *Lettieri*, 478 F.3d at 650 (recognizing that relevant evidence may be used to establish causation)) (alteration in *Roberts*). Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

In general, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654. In *Strothers*, 895 F.3d at 335–36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998)).

The Fourth Circuit has "held that causation can be inferred when 'the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646,

656 (4th Cir. 2017)).  But, the Fourth Circuit has cautioned that "'the temporal proximity must be very close.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (cleaned up).

Thus, for causation based on the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501.  Conversely, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Massaro*, 2024 WL 1162061, at *5 (citation omitted).

Of pertinence here, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, JFM-12-3267, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King*, 328 F.3d at 151 n.5); *see also Roberts*, 998 F.3d at 126 (three months).  Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

However, temporal proximity is not the sole avenue to establish causation.  *CSRA*, 12 F.4th at 417.  A plaintiff can "overcome an absence of temporal proximity" through "'evidence of recurring retaliatory animus during the intervening period' . . . ." *Massaro*, 2024 WL 1162061, at *6 (quoting *Lettieri*, 478 F.3d at 650) (cleaned up). The alternative path contemplates the existence

of facts indicative of an adverse action "'because of the protected activity.'"  *Roberts*, 998 F.3d at 123 (citation omitted).

### 2.   The Contentions

Defendant claims that the alleged protected activity "took place on December 10, 2020 and in March 2021."  ECF 20-1 at 12.  According to defendant, "Plaintiff fails to plead facts showing a causal connection between her December 10th [2020] complaint to Human Resources and either her March 2021 PIP or her May 2021 termination."  *Id.* at 13.  And, Becton contends that the five-month period between the complaint of December 10, 2020, and the termination in May 2021 is too long to constitute causation.  *Id.*  Thus, Becton argues that "the Amended Complaint fails to allege facts sufficient to state a claim for retaliation under the ADA (Count IV), Title VII (Count VIII), or the MFEPA (Count XIV)."  *Id.* at 11 (emphasis and capitalization removed).

Specifically, Becton asserts, *id.*: "Courts hold that, where a plaintiff relies solely on temporal proximity, a causal connection cannot be inferred when the two events are separated by a lapse in time as large as five months."  Further, Becton disputes plaintiff's claims that Pitcher's comments on December 11, 2020, "regarding 'poor performance' and his January 4[, 2021] email regarding the December 29 customer complaint" constitute adverse actions.  *Id.* at 14.  According to Becton, there is no "factual basis to support a causal connection" between plaintiff's Human Resources complaint on December 10, 2020, "and *either* her PIP (three months after the December 10 complaint) or her termination (five months after the December 10 complaint)."  *Id.* (emphasis in original).

Becton posits that "these communications do not even amount to an adverse action for purposes of retaliation claims under Title VII."  *Id.*  Further, Becton argues that Pitcher's alleged criticism of Campbell following the meeting of December 10, 2020, is not retaliatory because

"Plaintiff repeatedly states that Mr. Pitcher had been 'criticizing' (and allegedly 'berating') Plaintiff's performance before she took FMLA leave in July 2020, and well before she complained to HR on December 10." *Id.* And, Becton explains that the email exchange of January 4, 2021, between Campbell and Pitcher did not constitute retaliation but was instead a request by Pitcher to "understand what was happening with the account" Campbell managed. ECF 20-1 at 15. Becton also argues that "the Amended Complaint includes no facts to connect Plaintiff's termination to her March 2021 conversation with Ms. McGlone," which "occurred *after* Plaintiff was placed on the PIP." *Id.* at 16 (emphasis in original).

In response, plaintiff contends that she "engaged in protected activity on numerous occasions which satisfies the first element." ECF 21 at 31. She asserts, *id.*: "Requesting an accommodation under the ADA is protected activity." She also explains that protected activity under Title VII includes bringing "complaints of discrimination," complaining of "workplace sexual harassment" to a supervisor, and bringing complaints "through internal company procedures." *Id.* at 31–32. Thus, she avers, *id.* at 32: "Ms. Campbell certainly engaged in protected activity when she requested accommodations numerous times, complained of the sexual harassment, gender discrimination, and hostile work environment—first to Ms. Barlow in HR, then to Ms. McGlone in her role as Ms. Barlow's supervisor."

Plaintiff also contends, *id.*: "Ms. Campbell has sufficiently pled that she suffered multiple adverse employment actions, including being placed on a PIP on March 2, 2021, increased scrutiny on her job performance by Mr. Pitcher, being repeatedly reprimanded by Mr. Pitcher publicly and privately, and termination, in satisfaction of the second element." She explains that an adverse action can be demonstrated "by showing that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington Northern*, 548 U.S. at 68).  And, Campbell argues that she "was dissuaded from making accommodation requests and complaining about discrimination and harassment for fear of retaliation."  *Id.*

According to plaintiff, "[f]rom early on—in spring of 2020 and again in summer of 2020— Mr. Pitcher refused and discouraged Ms. Campbell's requests for reasonable accommodation" and "intimidated, ridiculed, and mocked her for seeking them."  *Id.* at 33.  She also maintains that Pitcher's "behavior became increasingly aggressive and hostile" following her accommodation requests, and his conduct "exacerbated [her] disabilities and symptoms."  *Id.*

Following plaintiff's accommodation request to McGlone in March 2021, plaintiff "finally received a request for information regarding her accommodation request."  *Id.*  However, Campbell argues, *id.*: "[A]t that time, Ms. Campbell was so consumed with Mr. Pitcher's unreasonable demands that in order to save her job, she felt she could not even leave work to visit a physician to complete the paperwork without Mr. Pitcher retaliating since he had previously discouraged her from seeking accommodations and made very clear his disdain for people with disabilities or mental health issues."

Campbell contends: "There is no requirement of an adverse employment action in an ADA failure to accommodate claim."  *Id.* at 33 n.11 (citing *Rhoads*, 257 F.3d at 387 n.11).  And, she explains that Campbell's "PIP may be construed as an adverse action since it included language suggesting that she may be at risk of 'further discipline, including termination.'"  *Id.* at 34 (quoting *Gatewood v. Office of the Comptroller of Md.*, AAQ-22-437, 2022 WL 11183326, at *4 (D. Md. Oct. 19, 2022)).  Further, as to adverse action, Campbell explains, ECF 21 at 33–34:

> Under the ADA, an employer's failure to accommodate itself constitutes an adverse employment action. *See Crabill*, 423 F.App'x at 324.[]  Under Maryland

law, a written reprimand is a formal disciplinary action. Md. Code, State Pers. & Pens. § 11-104(1). Under the ADA, Title VII, and the MFEPA, termination "indisputably constitute[s] adverse employment action." *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003); *Chang Lim*, 310 F.Supp.3d at 601; *see Rhoads*, 257 F.3d at 393 (collecting cases). A "PIP or a letter of warning may be an adverse action if it includes language suggesting a plaintiff may be at risk of 'further discipline, including termination.'" *Gatewood v. Off. of Comptroller of Md.*, No. 8:22-CV-00437-AAQ, 2022 U.S. Dist. LEXIS 191635, at *9 (D. Md. Oct. 19, 2022) (citing *Barnes v. Charles Cnty. Pub. Schs.*, 747 F.App'x 115, 119 (4th Cir. 2018) (per curiam)); *see Lazarte v. Montgomery Cnty. Pub. Sch.*, No. DLB-20-1515, 2021 U.S. Dist. LEXIS 232949, at *27 (D. Md. Dec. 6, 2021) (assuming that being "placed on a PIP[,]" "for purposes of…motion [to dismiss] is an adverse action in the retaliation context."); *Brown v. Hous. Auth. of Balt. City*, No. MJG-16-3616, 2017 U.S. Dist. LEXIS 118471, at *7 (D. Md. July 26, 2017) (presuming, for the purpose of a motion to dismiss, that at least plaintiff's placement on a PIP and her termination are both possible actionable adverse employment actions.). Furthermore, "whether a written reprimand [or PIP] will be sufficient will turn on the unique facts and circumstances in each individual case." *Gatewood*, 2022 U.S. Dist. LEXIS 191635, at *12.

Additionally, Campbell asserts that she meets the third element because she has shown temporal proximity. *Id.* at 35. Specifically, she avers that she engaged in protected activity in April 2020 when she made an accommodation request to Pitcher; in May 2020, when she made her first formal request for accommodation; and in June 2020, when she "again attempted to discuss her need for accommodations with Mr. Pitcher." *Id.* She explains that following these requests that revealed her disabilities, "Mr. Pitcher's behavior became increasingly aggressive and hostile." *Id.* at 36.

Further, Campbell posits that she engaged in protected activity when she took job-protected FMLA leave from July 15, 2020 through October 27, 2020. *Id.* And, "[o]n October 18, 2020, upon returning to work," she "made another request for reasonable accommodations for her ADHD and PTSD to Defendant through Sedgewick and she followed-up on multiple occasions." *Id.* Yet, Pitcher immediately "resumed berating her about her performance, reprimanding her verbally and in writing, and became overly critical of her." *Id.* For example, on November 4,

2020, one week following plaintiff's return, Pitcher complained about her performance, despite the fact that she had been on leave for four months. *Id.* And, on a November 19, 2020 field visit, "Mr. Pitcher berated [her] regarding her performance, holding her to the same numbers that her teammates who had not been on job-protected FMLA leave were held to." *Id.* The next day, Pitcher submitted a "Field Visit Follow Up" memorandum which outlined allegedly false information regarding Campbell's job performance. *Id.*

Then, on December 10, 2020, plaintiff "made another request for accommodations and filed her first formal HR complaint." *Id.* at 37. She contends that the very next day, "Mr. Pitcher singled her out and met with her regarding her alleged 'poor performance.'" *Id.* According to Campbell, Pitcher's treatment towards her then "escalated," and included an email on January 4, 2021, "citing a novel performance issue" she believed was intended "to paper her file." *Id.* And, on March 2, 2021, three months after plaintiff's formal HR complaint, she "was placed on a 60-day PIP with unrealistic expectations." *Id.* She alleges that "she made another accommodations request and complaint about Mr. Pitcher's continued harassment and retaliation via a phone call with Ms. McGlone" in March 2021. *Id.* And, Campbell was terminated on May 4, 2021. *Id.*

Campbell insists that Pitcher knew of her protected activity, *i.e.*, her complaints to HR. *Id.* She avers that "Ms. Barlow and Ms. McGlone both indicated that they, or someone from HR, would speak with Mr. Pitcher." *Id.* And, she contends that "Ms. McGlone also stated that the bikini photos were 'being taken care of' and that Mr. Pitcher 'had been addressed.'" *Id.* at 38. She notes that she is not required to plead how her supervisor knew of the complaints, but is instead only required to allege that to be the case. *Id.*

In addition, Campbell maintains that she has adequately alleged causation through "'other evidence of retaliatory animus.'" *Id.* (quoting *Lettieri*, 478 F.3d at 650). She argues that between

her first HR complaint in December 2020 and her May 2021 termination, "several retaliatory events occurred." *Id.* These include Pitcher becoming "increasingly aggressive and hostile" after Campbell informed him of her disabilities; Pitcher bombarding Campbell with "a constant barrage of emails, texts, and calls . . . criticizing and shaming her through verbal and written attacks"; Pitcher singling Campbell out on video calls; Pitcher copying his manager on emails; Pitcher "berat[ing] and penaliz[ing]" Campbell when she was out of work and followed the PTO policy; Pitcher placing Campbell on a PIP and requiring her to meet with him weekly, despite the fact that "she was exceeding expectations"; Pitcher "misrepresent[ing]" her work performance on her PIP; and Pitcher penalizing Campbell for not selling an expensive product, despite the fact that no team members had yet sold the product. *Id.* at 38–39.

Finally, plaintiff contends that "her gender, disabilities, failure to submit to Mr. Pitcher, and leave were the but-for cause of her termination." *Id.* at 40. She explains that it is sufficient to allege that her "failure to complete the difficult and unnecessary task of selling" the aforementioned expensive product, "and her tardiness and missed deadlines due to never being accommodated for her known and documented disabilities were eventually cited as reasons for her termination." *Id.*

In Reply, defendant argues that plaintiff has not alleged a causal connection, as required by the retaliation standard. ECF 22 at 10. Specifically, defendant asserts, *id.* at 11: "Due to the absence of temporal proximity between Plaintiff's protected activity and any adverse employment action,[] the events pled by Plaintiff to show a causal connection must suggest that Plaintiff's PIP and termination occurred *because of the Plaintiff's protected activity*." (Emphasis in original). And, defendant claims that this is not the case. BD argues, for example, that "[t]he only complaint allegedly known to Mr. Pitcher that Plaintiff *directed at* Mr. Pitcher regarding conduct covered by

the ADA, Title VII, or the MFEPA is Plaintiff's December 10[, 2020] complaint to Human Resources involving, among other things, the 'bikini' photo." *Id.* (emphasis in original). Defendant contends that the March 2021 complaint to McGlone regarding Pitcher "occurred *after* Plaintiff was put on a PIP, so it could not have influenced the initiation of the PIP." *Id.* (emphasis in original). Thus, defendant argues that the McGlone meeting "cannot have precipitated Plaintiff's PIP or Mr. Pitcher's termination of her employment." *Id.*

Becton also asserts, *id.* at 12: "The question of causation then comes down to the existence of facts supporting a causal linkage between Plaintiff's December 10 Human Resources complaint and her subsequent PIP and termination in March and May." And, Becton claims that the alleged "'retaliatory acts'" cited by plaintiff "*actually occurred* at various times *well before* Plaintiff's December 2020 complaint to Human Resources," and thus cannot be used "as evidence of Mr. Pitcher's desire to retaliate against Plaintiff for making that complaint." *Id.* (emphasis in original).

Moreover, Becton contends that the evidence plaintiff characterizes as "'recurring retaliatory animus'" is merely "a series of ordinary supervisory exchanges," which does not "reflect any retaliatory intent whatsoever on the part of Mr. Pitcher." *Id.* Becton explains that Pitcher's criticism of plaintiff on December 11, 2020 and on January 4, 2021, were not "unusual" and do not reflect retaliatory intent. *Id.* at 12–13. And, Becton contends that Pitcher's response to plaintiff's use of vacation in February 2021 was "technically correct" and that he did not show "disdain or animosity toward" plaintiff. *Id.* at 13. In sum, Becton argues, *id.* at 14: "These exchanges do not reference any protected activity by Plaintiff or reflect anything other than a supervisor's efforts to supervise an employee who reports to him."

### 3.  Discussion

In my view, plaintiff has adequately alleged retaliation claims under the ADA, Title VII, and the MFEPA, sufficient to defeat the Motion.

Defendant does not dispute that plaintiff engaged in protected activity.  Indeed, plaintiff alleges that she repeatedly engaged in protected activity, including when she informed Pitcher and Becton of her disabilities in the fall of 2019; when she informed Pitcher of her disabilities in May 2020; when she took FMLA leave from July 15, 2020, through October 27, 2020; when she submitted a formal accommodation request to Sedgewick in October 2020; when she made her HR complaint on December 10, 2020, and at her meeting with Barlow; at her meeting of December 20, 2020, with McGlone; and at her meeting in March 2021 with McGlone. *See, e.g.*, ECF 19, ¶¶ 45, 49–50, 63, 80–87, 101, 128, 140–43, 145–46, 149–50, 152, 161, 163–64, 198, 315, 369.

Plaintiff has also alleged adverse action.  And, defendant does not dispute that the PIP and the job termination on May 4, 2021, constitute adverse actions.

Becton's central claim is that plaintiff's protected activity was not causally connected to the adverse actions, *i.e.*, the PIP or plaintiff's termination, because the allegations, even if true, do not establish a temporal relationship. *See, e.g.*, ECF 20-1 at 13.  In particular, Becton notes that plaintiff  engaged in protected activity at the meeting of December 10, 2020, but the PIP was not imposed until March 2, 2021, and the termination did not occur until May 4, 2021.

Less than three months passed between plaintiff's protected activity on December 10, 2020, and the imposition of the PIP on March 2, 2021.  Arguably, the intervening holiday season could be a factor in assessing whether the lapse in time qualifies as an adequate temporal link.

In any event, temporal proximity is not the only basis on which a plaintiff may establish causation.  Plaintiff also alleges numerous examples of retaliatory animus throughout her employment, both before and after December 10, 2020.

Of relevance, plaintiff alleges that, during the time period between her complaint to HR on December 10, 2020, and her termination on May 4, 2021, "several retaliatory events occurred." ECF 21 at 38.  In her suit, plaintiff contends that, following her Complaint on December 10, 2020, Pitcher's "behavior toward [her] not only continued but worsened."  ECF 19, ¶ 110; *see also id.* ¶ 262.  And, she alleges that, "[d]espite alerting HR, nothing was done regarding Mr. Pitcher's behavior and Ms. Campbell continued to face Mr. Pitcher's unwanted, unprofessional, and harassing behaviors, which only escalated following" her complaint on December 10, 2020.  *Id.* ¶ 260; *see also id.* ¶ 248.

Campbell notes that on December 11, 2020, Pitcher "singled [her] out and met with her regarding her 'poor performance.'"  *Id.* ¶ 104; *see also id.* ¶¶ 264, 282, 372.  She also points to "a constant barrage" of "emails, text messages, and phone calls" that she received from Pitcher, who berated and penalized her.  *Id.* ¶ 66; *see id.* ¶¶ 110, 111, 243, 264.  On January 4, 2021, Pitcher emailed Campbell, "citing a performance issue that had never been raised before . . . ."  *Id.* ¶ 111; *see also id.* ¶ 264.  And, on March 2, 2021, when plaintiff was placed on a PIP, she nonetheless had "continued to exceed her sales targets . . . ."  *Id.* ¶ 113; *see also id.* ¶¶ 264, 284; ECF 21 at 39.

Again, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden," *Strothers*, 895 F.3d at 335, and "very little evidence of a causal connection is required . . . ."  *Roberts*, 998 F3d at 127 (citing *Burgess*, 466 F. App'x at 283).  At this stage plaintiff's allegations are sufficient.  Accordingly, I shall deny the Motion as to Counts IV, VIII, and XI.

### IV. Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 20) in part and deny it in part. Specifically, I shall dismiss Count V, with prejudice.  But, I shall deny the Motion as to Counts I, IV, VII, VIII, X, XI, and XIV.

An Order follows.


Date:  March 27, 2024                              _____/s/_____

Ellen L. Hollander
United States District Judge